[No. S004786. Crim. No. 26420. Dec. 28, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
PAUL PALALAUA TUILAEPA, Defendant and Appellant.

570

COUNSEL

Howard W. Gillingham, under appointment by the Supreme Court, and Allison Wilensky for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, William T. Harter, Susan Lee Frierson and Patrick T. Brooks, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

BAXTER, J.—A jury convicted defendant Paul Palalaua Tuilaepa of the first degree murder and attempted robbery of Melvin Whiddon. (Pen. Code, §§ 187, subd. (a), 211/664.)[1] Defendant was also convicted of six counts of robbery (Lee Malstrom, Russell Knapp, Gary Grose, Larry Swanson, Debra Tomassini, and Bruce Monroe) and of two counts of assault with a firearm (Kelvin Whiddon and Kenneth Boone). (§§ 211, 245, subd. (a)(2).) An allegation that defendant personally used a rifle in the commission or attempted commission of each of the foregoing offenses was found true. (§§ 12022.5, 1203.06, subd. (a)(1).) An allegation that defendant inflicted great bodily injury in committing one of the robberies (Bruce Monroe) and both of the assaults (Kelvin Whiddon and Kenneth Boone) was also found true. (§ 12022.7.) Finally, the jury found true a special circumstance that the

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

murder of Melvin Whiddon occurred during the commission of a robbery. (§ 190.2, subd. (a)(17)(i).)

Following a penalty trial, the jury sentenced defendant to death and the trial court denied the automatic motion to modify the verdict. (§ 190.4, subd. (e).) This appeal is automatic. (§ 1239, subd. (b).)

We find no prejudicial error at the guilt or penalty phases of defendant's trial. The judgment will be affirmed in its entirety.

## I. Guilt Phase Evidence

The crimes occurred at 5:30 p.m. on October 6, 1986, at the Wander Inn Bar in Long Beach. Eight surviving victims were called as witnesses for the prosecution at trial. Viewed as a whole, their eyewitness testimony established the following sequence of events:

A small crowd had gathered to watch Monday night football on television. The front and rear doors were open, and daylight streamed in. The interior lights were on, including those located directly above the bar.

Defendant and another man entered the establishment.[2] Defendant wore a dark jacket and the other man wore a long dark coat. Both men also apparently wore hairnets and "khaki" clothes of some sort. All eight eyewitnesses noticed that defendant was carrying a rifle, and many of them recognized it as a .22-caliber weapon. No one actually saw a weapon in the hands of the other man but—based on the testimony of one witness described below—it appears he was carrying a firearm under his coat.

Defendant and his partner approached the bartender, who was standing at the cash register behind the bar with his back to the room. The bartender heard some shouting and turned around. Defendant pointed the rifle in his face and demanded money—"everything" in the register. The bartender, Malstrom, pulled the tray out of the register and set it and the cash on the bar. Defendant and his partner stuffed the money into their pockets.

The pair then split up and began robbing patrons at the bar. Defendant, who was still holding the rifle, moved down the bar to Malstrom's left and confronted three victims. Specifically, defendant took money belonging to Knapp that was lying on the bar in front of him. Defendant then pushed Grose and grabbed his money from the bar and took his wallet. Defendant also pushed Swanson and took his wallet.

---

[2]Defendant was tried alone. His partner was not identified in these proceedings.

Meanwhile, defendant's accomplice took money and a wallet from two victims on the opposite side of the bar—Tomassini and Monroe. When the accomplice reached the end of the bar on his side of the room (i.e., to the bartender's right), he encountered twin brothers Melvin and Kelvin Whiddon. The accomplice pushed Melvin from behind, demanded money, and reached for his wallet. Melvin spun around on his stool and started fighting with the robber. At some point, Melvin knocked the accomplice to the ground.

There was no dispute among witnesses that defendant walked towards the scuffle and, holding the rifle at hip or waist level, shot Melvin in the neck.

Defendant then swung the rifle in Kelvin's direction. Kelvin dropped to the floor and tried to hide behind a post, but was shot by defendant in the chest.

Defendant then turned the rifle in the direction of Monroe's wife. Monroe jumped in front of her and was shot by defendant in the abdomen.

Another patron, Boone, testified that after defendant started shooting, the accomplice stood up and "a couple flashes"—presumably gunshots—came from underneath the accomplice's coat. Both robbers then ran past Boone towards the rear door. Before exiting the bar, defendant aimed the gun at Boone, smiled, and shot him in the neck.

The first shooting victim, Melvin, died at the scene. The autopsy physician described the nature of Melvin's injuries at trial. The other three gunshot victims—Kelvin, Monroe, and Boone—testified about the serious and, in some cases, permanent physical injury they sustained.

All eight eyewitnesses positively identified defendant at trial and at the preliminary hearing. Each testified that they clearly saw defendant's face from a few inches to a few feet away. Almost everyone had consumed only part of a beer or other alcoholic beverage, and no one had consumed more than one and a half beers.

Of course, not everyone saw, remembered, or described exactly the same details at trial. For example, Knapp positively identified defendant as the man holding the rifle but never saw a second robber. All other witnesses saw both men, but most of them did not get a good look at defendant's accomplice. Tomassini was able to describe what both men were wearing in the greatest detail, and she was the only person who mentioned the khaki clothes and hairnets. In contrast, Malstrom thought defendant might have been

wearing a "watchcap," and he did not notice anything on the other robber's head. In addition, while Tomassini believed the incident lasted 10 to 15 minutes, all other witnesses estimated that it lasted 5 minutes or less. As noted, only Boone suggested that defendant's accomplice was armed.

The prosecution also introduced the testimony of Police Officer Pavek who arrived at the scene shortly after the robbery. He testified that the bar was "in shambles," that there were bloodstains on the floor, and that three casings and two expended bullets from a .22-caliber weapon were found inside. Other details about the investigation were not presented at trial.

The defense presented no evidence at the guilt phase.

## II. PENALTY PHASE EVIDENCE

### A. *Prosecution Case*

The prosecution presented evidence of several prior crimes and misdeeds by defendant. None were adjudicated, and all occurred while defendant was in custody, primarily with the California Youth Authority (CYA). Defendant's objections to this evidence will be discussed later in the opinion.

1. *Assault—1982.* Sam Fong, a CYA counselor, testified that in May 1982, he witnessed a fistfight between defendant and another ward, Gages. Fong restrained defendant with a chokehold, and another counselor pulled Gages aside. Gages sat down and began "tending to his wounds." When Fong eased his chokehold, defendant lunged at Gages but was quickly subdued again by Fong. Defendant threatened to "get" Gages and "the Northerners," and ordered a nearby comrade to get a knife.

Fong explained that rival gangs from the "North and South" populated the facility, and that Gages was from the North and defendant was from the South. Fong also noted that even though wards were prohibited from possessing knives, they were sometimes made or smuggled inside. A search revealed no knife in the possession of defendant or his comrade. However, the fight between defendant and Gages violated institutional rules and was reported.

2. *Threats—1982.* In July 1982, Debra Heron worked as a counselor at a maximum security CYA facility. Heron testified that defendant became verbally abusive when she patrolled the hall outside his cell two different nights. His remarks consisted of sexual taunts and death threats (e.g., "[I'm] going to fuck [you] in [your] fat white ass, bitch" and "rape [you] and [you

will] like it" and "kill you [and] your Momma, too"). During one of the episodes, defendant threw a liquid substance against a screened area of the cell—"tomatoes and possibly water or urine or something of that nature." Cell doors were locked on both occasions. Heron did not believe she was in imminent danger, but defendant's remarks violated institutional rules and were reported.

3. *Weapons possession—1984.* CYA counselor Lester Kushner testified that in October 1984, he noticed the "remains of some broken razors" in defendant's cell or on the floor nearby. Institutional rules precluded wards from possessing more than one razor and from removing the blade. A search revealed two razor blades and two other intact razors on defendant's person. "[O]ther contraband indicating gang-related type items" and several batteries taped together were also found in defendant's cell. Kushner explained that the latter item, "a battery pack," was typically held in the hand and used as a punching or striking device. Defendant was the sole occupant of the cell in which the foregoing items were found. Possession of them violated institutional rules and was reported.

4. *Threat—1984.* CYA employee Gregory Bron testified that in November 1984, defendant attended class wearing pants in which the seams had been cut. Bron escorted defendant to his quarters, confiscated the pants, and told defendant he would be issued a new pair and cited for destroying state property. Defendant said he would burn the pants and burn Bron's face. Bron explained that other wards had previously injured staff by igniting "match bombs," i.e., small containers packed with severed matchheads. Bron did not believe he was in imminent danger, but defendant's remarks violated institutional rules and were reported.

5. *Threats—1985.* In September 1985, Michelle McDowell Roberts worked as a supervisor at a maximum security CYA facility. Roberts testified that defendant became verbally abusive when she patrolled the hall outside his room two different nights. He threatened some sort of torture and death, and sexually taunted her (e.g., "how would I like his dick up my ass"). On both occasions, defendant was locked in a room or cell. Roberts apparently did not believe she was in imminent danger, but defendant's remarks violated institutional rules and were reported.

6. *Assault—1986.* Robert Sedillo, a CYA supervisor, described an incident that occurred when he escorted defendant from the infirmary in May 1986. Defendant kicked another ward in the face as he sat in the hallway waiting for a medical appointment. The attack appeared to be unprovoked, and both defendant and his victim had their hands handcuffed behind their backs at the time. The assault violated institutional rules and was reported.

7. *Robbery and assault—1987.* Daniel Chatters and defendant shared a cell in the courthouse lockup at the time of trial in this case. Chatters testified that a few days before his testimony, defendant became angry when Chatters would not give money to defendant. Defendant repeatedly struck and injured Chatters, and took $12 that Chatters was carrying on his person.

B. *Defense Case*

1. *Family history.* Defendant's mother, Mrs. Tuilaepa, and his sister Sanita testified as follows: Defendant was raised in a two-parent home and is the youngest of twelve children. The family moved to the United States from Samoa when defendant was a boy. Mrs. Tuilaepa never learned to speak English, and the family apparently communicates in Samoan.

Defendant was purportedly well behaved as a child. However, he began getting into trouble with his friends at age 14 or 15, and was periodically removed from the home by authorities.

The family has experienced many difficulties over the years but has apparently remained close. Defendant's father died a few years before the capital trial, and one of defendant's brothers was shot and killed in a fight. Another brother, Joe, was shot at a party and is now paralyzed and confined to a wheelchair. As adults, defendant and Joe lived with their mother, and defendant assisted in Joe's care. Sister Sanita and her husband were active in the church and, along with their children, lived with Mrs. Tuilaepa. Several family members regularly attended the capital trial. Mrs. Tuilaepa and Sanita testified that the family cares for defendant and wants his life to be spared.

2. *Expert testimony.* Dr. Maloney, a psychologist, performed various psychological and intelligence tests on defendant and interviewed members of his family. Dr. Maloney saw no sign of "neurological disability," but noted defendant appeared depressed and reticent when interviewed. Defendant performed poorly on verbal tests and received an IQ score in the low 70's, placing him in the bottom 5 percent of the population. However, on tests of nonverbal reasoning, defendant performed in the normal range. Dr. Maloney concluded that defendant has "normal intellectual potential" but is deficient in his knowledge and understanding of English. The results were "not surprising" since defendant spent the first few years of his life in Samoa and the family communicates primarily in Samoan. Dr. Maloney testified that defendant has the mental capacity to understand that homicide is wrong.

### III. GUILT PHASE ISSUE

Defendant challenges the guilt judgment solely on the ground he was improperly shackled in the trial court. For reasons we will explain, no prejudicial error occurred.

## A. *Background*

The contemporaneous record of proceedings before and during trial is silent on whether defendant was shackled or physically restrained.

Appellate counsel raised the shackling question towards the end of a record settlement and correction hearing held about a year after the penalty verdict was rendered. The hearing was conducted by the judge who presided at trial and took place in the same courtroom. The district attorney who prosecuted the case and defendant's trial and appellate counsel were also present.

■ In response to appellate counsel's request for a stipulation on whether defendant was restrained during trial, the district attorney, trial counsel, and the court orally agreed that defendant's ankles were always shackled in some manner, but that his chair was pushed "all the way" under the table so the jury could not see his feet. None of these participants recalled any handcuffs or chains on defendant's wrists, hands, or waist in the jury's presence. The district attorney and trial counsel maintained that defendant entered and exited the courtroom through a rear door that was evidently private, and that the jury "always" waited outside in the hallway until defendant was seated and his ankle restraints were presumably hidden from view. In response to a specific reference in the record on voir dire, no one recalled whether defendant actually stood up and faced prospective jurors while shackled.[3]

Trial counsel testified at the record settlement hearing in a manner consistent with the foregoing stipulated facts. Counsel further recalled under oath that defendant was thought to be dangerous and a flight risk during trial because he and a brother in attendance were gang members.

Defendant testified at the same hearing but gave a somewhat different version of events. Defendant said he always wore ankle shackles and occasionally wore handcuffs and a waistchain in the courtroom and courthouse. Defendant claimed he "sometimes" entered the courtroom through the private door and "sometimes" entered through the outer hallway. Defendant testified that, on some of the latter occasions, he could "see jurors" in the hall. He did not say whether they were jurors in his case or whether they saw him.

Over the district attorney's objection, appellate counsel was allowed to conduct an "experiment" in an effort to "settle" the record as to whether

---

[3]The record indicates that, during voir dire, the court asked defendant to stand up and turn towards prospective jurors "if you can." Appellate counsel suggests here, as at the record settlement hearing, that this language implies defendant was restrained at the time.

defendant's restraints could have been seen by the jury. At the direction of appellate counsel, trial counsel stood and sat in the "general area" of the jury box and said he could see the waist chain and ankle shackles defendant was then wearing. The district attorney and trial counsel each observed, however, that some of the furniture, particularly defendant's chair, was not in the same position during the experiment as during trial.

Appellate counsel also moved to take photographs of the courtroom and send a questionnaire to jurors asking whether defendant had been restrained during trial. The district attorney objected on grounds such matters could not properly be included in the appellate record. The court agreed and denied defendant's request.

The court did not make any findings or issue a settled statement about shackling after the hearing.

## B. *Analysis*

Based on the foregoing facts, defendant assumes he was subjected to physical restraints that were visible to the jury. Defendant observes there was no evidence or finding of a "manifest need" for such security measures and no instruction informing the jury to disregard the restraints as required by *People* v. *Duran* (1976) 16 Cal.3d 282, 291-292 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1]. According to defendant, noncompliance with *Duran* prejudicially violated his rights under the Fifth, Sixth and Eighth Amendments to the federal Constitution and comparable provisions of the state Constitution (art. I, § 7) and statute (§ 688).

We disagree. It is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal. Defendant's failure to object and make a record below waives the claim here. (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 95 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Walker* (1988) 47 Cal.3d 605, 629 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Duran, supra,* 16 Cal.3d 282, 289.)

In apparent recognition of the waiver problem, defendant argues trial counsel was ineffective in failing to object to the use of restraints. However, counsel's performance could not possibly have affected the outcome at trial. The guidelines imposed by *People* v. *Duran, supra,* 16 Cal.3d 282, 290, are intended, in large part, to avoid prejudice in the minds of jurors where a defendant appears or testifies in obvious restraints, or where the restraints deter him from taking the stand in his own behalf. We have consistently found any unjustified or unadmonished shackling harmless where there was

no evidence it was seen by the jury. (*People* v. *Cox* (1991) 53 Cal.3d 618, 652 [280 Cal.Rptr. 692, 809 P.2d 351] [defendant's handcuffs and leg braces not seen by jury]; *People* v. *Medina* (1990) 51 Cal.3d 870, 897-898 [274 Cal.Rptr. 849, 799 P.2d 1282] [same]; see also *People* v. *Allen* (1986) 42 Cal.3d 1222, 1264 [232 Cal.Rptr. 849, 729 P.2d 115] [shackles of defense witness not seen by jury]; *People* v. *Fierro* (1991) 1 Cal.4th 173, 220 [3 Cal.Rptr.2d 426, 821 P.2d 1302] [defendant's handcuffs and shackles not seen by key prosecution witness at preliminary hearing].) In *Cox* and *Medina*, we also found no evidence the restraints influenced the defendant's decision not to take the stand.

Nothing in the record on appeal clearly establishes that the jury did or could see defendant's restraints. The court and counsel agreed that efforts had been taken to conceal defendant's ankle shackles from the jury whenever he appeared in court. Defendant's posttrial "experiment" did not conclusively show such efforts had failed. Defendant's version of events also implied, at most, that jurors might have seen him handcuffed and/or shackled in the hallway of the courthouse and might have assumed such restraints were not removed during trial. However, the trial court made no findings in this regard and never credited defendant's account. In addition, defendant did not testify at any phase of trial and there is no indication he would have testified but for the restraints.

Even assuming the jury saw the restraints under the circumstances suggested by defendant, the result remains the same. Prejudicial error does not occur simply because the defendant "was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen." (*People* v. *Duran*, *supra*, 16 Cal.3d 282, 287, fn. 2.) The judgment was reversed in *Duran* based on multiple errors in a close case, including improper exclusion of evidence, restrictive cross-examination, and the heavy shackling of a defendant who took the stand and whose credibility was presumably damaged as a result. (*Id.*, at pp. 295-296.) In subsequent cases, however, visible shackling did not warrant reversal of the judgment. (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 946 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1084-1085 [248 Cal.Rptr. 510, 755 P.2d 960].)

The instant case is analogous to *Sheldon* and *Rich*. Strong guilt evidence in the form of eight positive eyewitness identifications established that defendant shot four individuals and killed one of them in the course of robbing people in a neighborhood bar. No other guilt errors are raised on appeal or are evident from the record, and no prejudicial error occurred at the penalty phase for reasons we will explain. Defendant elected not to testify in his own

behalf. Any glimpse jurors might have received of the restraints as defendant entered the courtroom could not possibly have shocked them or affected their assessment of the evidence.[4]

■ Defendant also argues the trial court erred in denying his posttrial motion to "settle" the record with photographs of the courtroom and jury questionnaires about shackling. Defendant insists he was deprived of his right to an adequate record and meaningful appeal as a result.

We disagree. The rules authorizing settlement, augmentation, and correction of the record on appeal concern documents "file[d] or lodged" in the superior court and transcripts of "oral proceedings" that occurred therein. (Cal. Rules of Court, rules 7(b), 12(a), 36(b).) These provisions—much like the entire network of rules governing matter properly included in the appellate record—are intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court. (See, e.g., *People* v. *Pinholster* (1992) 1 Cal.4th 865, 922 [4 Cal.Rptr.2d 765, 824 P.2d 571] [settled statement of unreported bench conferences between court and counsel]; *People* v. *Wright* (1990) 52 Cal.3d 367, 401, fn. 6 [276 Cal.Rptr. 731, 802 P.2d 221] [settled statement of unreported bench discussion between court and juror]; *People* v. *Holloway* (1990) 50 Cal.3d 1098, 1116 [269 Cal.Rptr. 530, 790 P.2d 1327] [settled statement of unreported in-chambers discussion between court and counsel].) The settlement, augmentation, and correction process does not allow parties to create proceedings, make records, or litigate issues which they neglected to pursue earlier.

Because there were no motions or oral proceedings concerning shackling in the trial court, there was nothing for the parties to "settle" here. Defendant is entitled to an appellate record that accurately reflects what was done and said in the trial court—not what he wishes had been done or said. It follows

---

[4]Defendant asks that we take judicial notice of two juror declarations, one by Foreman Sheby and the other by Alternate Juror Shilinga. Although the declarations differ in several respects, Sheby and Shilinga agree that they occasionally saw defendant enter the courtroom in some type of restraints and neither one says the restraints were thereafter removed.

Contrary to what defendant argues, the facts asserted in the declarations are subject to dispute, are not readily verifiable, and are not the proper subject of judicial notice. (Evid. Code, § 452, subd. (h); see also Evid. Code, § 459.) The declarants themselves disagree on the frequency and type of restraints, and they do not uniformly describe the vantage point from which the restraints were allegedly seen. Similar discrepancies also exist between the juror declarations on the one hand and the facts as remembered by the court and counsel at the record settlement hearing on the other hand.

In any event, the declarations add little to defendant's posttrial testimony suggesting jurors might have seen his restraints as he entered the courtroom. No prejudice is shown for reasons already stated.

that all of defendant's posttrial efforts to create a record on this issue were unauthorized and incompetent. Hence, the trial court's decision to bar some of these efforts, namely photographs and questionnaires, cannot warrant reversal of the judgment.

## IV. PENALTY PHASE ISSUES

### A. *Death-qualifying Voir Dire*

At defendant's request, the court limited voir dire on the death penalty to four standard questions based on *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*). Under *Witherspoon*, a prospective juror can be excluded for cause where he makes it "unmistakably clear" he would "automatically" vote a certain way on penalty. (*Id.*, at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) A juror with such views is also "substantially impair[ed]" and excludable under *Wainwright* v. *Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 851, 105 S.Ct. 844] (*Witt*). *Witt* clarified *Witherspoon* and was decided before jury selection began in this case.

The court instructed prospective jurors before individual voir dire began (see *Hovey* v. *Superior Court* (1980) 28 Cal.3d 1, 80 [168 Cal.Rptr. 128, 616 P.2d 1301]) that they were to give yes or no answers to the foregoing questions. During each individual session, the court typically presented the *Witherspoon* questions, sought some clarification, and then permitted counsel to ask follow-up questions.

■ Defendant first challenges the manner in which the court questioned three prospective jurors (Maloney, Harris, Donlan). Defendant insists the court "coerced" them into answering "yes" to the *Witherspoon* questions that sought to ascertain a pro-life bias. Defendant also contends the court failed to vigorously pursue whether the "yes" answers given were sincere and unequivocal. The prosecutor successfully challenged Maloney and Harris for cause, and used a peremptory challenge to strike Donlan.

We see no error in the court's voir dire. As to all three jurors, the court indeed urged a definitive answer where an equivocal or ambiguous one was initially given, or re-asked the question in a slightly different way when a "yes" answer was given. However, the questions logically called for a definitive answer, and there was nothing inherently coercive in the court's method. We can only assume the court ended questioning when it determined that the "yes" answer given by each juror was sincere. No restrictions were placed on defendant's right to question them further.

■ Defendant contends trial counsel was ineffective in failing to sufficiently rehabilitate five prospective jurors who indicated to the court that

they were predisposed against the death penalty (Maloney, Harris, Haley, Groeppel, and Sedlack). The prosecutor successfully challenged all of them for cause.

Nothing in the record indicates that counsel lacked a plausible, tactical reason for asking these individuals few or no follow-up questions. (See, e.g., *People* v. *Lewis* (1990) 50 Cal.3d 262, 289-290 [266 Cal.Rptr. 834, 786 P.2d 892].) Indeed, counsel might have determined from the demeanor of these prospective jurors that additional questioning would be futile. Counsel might also have reasonably concluded that any ambiguity in the answers they had already given would be beneficial and would promote retention of pro-life jurors.[5] No constitutional deficiency in counsel's performance on voir dire has been shown.[6]

## B. *Boyd Claim*

Defendant challenges several unadjudicated acts of misconduct admitted in the prosecution's case-in-chief at the penalty phase. Defendant observes that "criminal activity" involving the "use or attempted use of force or violence or the express or implied threat to use force or violence" is admissible under section 190.3, factor (b) (hereafter factor (b)). Defendant argues here, as he did to some extent below, that the challenged evidence does not satisfy the "crime" and/or "violence" requirement of factor (b), and that it was therefore irrelevant to any statutory aggravating factor. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 772-778 [215 Cal.Rptr. 1, 700 P.2d 782].)[7]

■ On appeal, such claims must be rejected where there is substantial evidence from which a jury could conclude beyond a reasonable doubt that violent criminal activity occurred. (*People* v. *Boyd, supra,* 38 Cal.3d at p. 778.) As we will explain, no prejudicial error occurred in this post-*Boyd* penalty trial.

1. *Assault—1982.* ■ Defendant first complains about Fong's testimony describing a fistfight between defendant and another CYA inmate.

---

[5]For example, in response to the court's questioning, prospective Juror Harris ambiguously indicated that she had "mixed" feelings about the death penalty and believed it was appropriate "in some cases," but that she would "automatically" refuse to consider or vote for it in the instant case. Defense counsel then asked Harris whether any preference for life imprisonment extended to "every" case, and she said, "yes." Counsel asked no further questions. He could reasonably have concluded that further inquiry along these lines might only solidify Harris's apparent pro-life bias and increase the likelihood that she would be excused.

[6]Defendant also argues trial counsel was ineffective because he did "nothing" to explore prospective jurors' attitudes towards racial prejudice. However, counsel has no duty in the abstract to inquire on a particular subject. There is also no indication that any biased individual actually sat on defendant's jury.

[7]For the most part, any *Boyd* objections raised below were handled in an evidentiary hearing held before the start of the penalty trial.

Defendant recognizes that evidence of a "jailhouse scuffle" is admissible under factor (b) where the jury could conclude the defendant was not acting in self-defense and was therefore guilty of criminal assault. (*People* v. *Lucky* (1988) 45 Cal.3d 259, 291 [247 Cal.Rptr. 1, 753 P.2d 1052].) Defendant appears to concede that Fong's "scuffle" testimony was admissible under *Lucky*, but asks us to reconsider that rule.

We decline to do so. The Attorney General correctly observes that defendant did not object to this evidence on any grounds at trial, and has therefore waived the claim. (*People* v. *Mickle* (1991) 54 Cal.3d 140, 186 [284 Cal Rptr. 511, 814 P.2d 290].) In any event, Fong's testimony strongly suggests that defendant was not only a willing combatant but the aggressor in the incident. (*People* v. *Lucky, supra*, 45 Cal.3d 259, 291.) Defendant apparently had the upper hand in the fight because only his opponent, Gages, was injured. Even after defendant was restrained and Gages retreated to nurse his wounds, defendant attempted to inflict additional harm and threatened future retaliation when officials intervened a second time. The penalty jury was entitled to know that defendant engaged in such disruptive, assaultive behavior in custody.

█ Defendant also insists the court erred in allowing Fong to suggest that defendant's threat against Gages and other "Northerners" was a gangland reference, and that the two combatants were affiliated with rival groups. Defendant insists this evidence was irrelevant and prejudicial, and that it should have been excised from any otherwise admissible portion of Fong's testimony.

Lack of an objection at trial waives the claim on appeal. And, contrary to defendant's suggestion on the merits, nothing bars evidence of gang affiliation that is directly relevant to a material issue. (Compare *Dawson* v. *Delaware* (1992) 503 U.S. __ [117 L.Ed.2d 309, 318, 112 S.Ct. 1093, 1098]; *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904-906 [184 Cal.Rptr. 165, 647 P.2d 569].) Testimony linking defendant and Gages to rival gangs was admissible because it tended to explain the reason for the fight. (See *People* v. *Melton* (1988) 44 Cal.3d 713, 757 [244 Cal.Rptr. 867, 750 P.2d 741].) We have only suggested a contrary result under factor (b) where no connection between prison gangs and violent prison crime was made. (See, e.g., *People* v. *Malone* (1988) 47 Cal.3d 1, 30 [252 Cal.Rptr. 525, 762 P.2d 1249].) Here, the jury was entitled to know that the assault on Gages was evidently not the product of a personal grievance but of a larger social evil.

2. *Weapons possession—1984.* █ Defendant next challenges Kushner's testimony describing several unauthorized items found in defendant's

CYA cell. Defendant claims that, because the extra razors and razor blades and the "battery-pack" are not inherently "deadly," there was insufficient evidence from which the jury could infer he violated laws prohibiting possession of deadly weapons by inmates. (See, e.g., § 4574, subd. (a).) Defendant also suggests mere possession of even a deadly weapon does not involve the threat of violence. He does not dispute that discovery of the items on his person and in his cell amounted to "knowing" possession.

We reject the Attorney General's suggestion that the claim has been waived. Defendant preserved the issue by raising a similar, comprehensive challenge to the "razor incident" before the evidence was admitted at trial.

Nevertheless, the claim fails on the merits. It is settled that a defendant's knowing possession of a potentially dangerous weapon in custody is admissible under factor (b). Such conduct is unlawful and involves an implied threat of violence even where there is no evidence defendant used or displayed it in a provocative or threatening manner. (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1186-1187 [270 Cal.Rptr. 286, 791 P.2d 965]; *People* v. *Lucky*, *supra*, 45 Cal.3d 259, 291-292; *People* v. *Harris* (1981) 28 Cal.3d 935, 962-963 [171 Cal.Rptr. 679, 623 P.2d 240].) The trier of fact is free to consider any "innocent explanation" for defendant's possession of the item, but such inferences do not render the evidence inadmissible per se. (*People* v. *Mason* (1991) 52 Cal.3d 909, 956-957 [277 Cal.Rptr. 166, 802 P.2d 950].) Hence, the court did not err in admitting evidence about the razors and blades and the "battery-pack" found in defendant's possession while in CYA custody.

■ Defendant also argues that Kushner's related testimony about "contraband" of a "gang-related" nature was inadmissible because there was no evidence defendant's possession of these unspecified items was criminal or involved any threat of violence. We agree. However, the reference to "contraband" was brief and vague and could not have been prejudicial in light of other more serious evidence of defendant's misconduct in custody, namely, weapons possession, three separate assaults, and one robbery. Similarly, Kushner's reference to the possession of "gang" paraphernalia was cumulative given other properly admitted testimony about the gang-motivated assault upon Gages.

3. *Threats—1982, 1984, 1985.* As noted, the prosecution introduced evidence of several outbursts while in CYA custody. Two female employees, Heron, a counselor, and Roberts, a supervisor, testified that defendant was locked in his cell in a maximum security facility at the time he made sexual taunts and death threats, and Roberts said defendant threw a vile liquid

against a screened area of the cell during one of the episodes. A male adviser, Bron, testified that he reprimanded defendant for cutting the seams on his pants and that defendant threatened to burn the pants and burn Bron's face. Bron also mentioned the use of "match bombs" by other inmates.

 Defendant challenges testimony by all three witnesses recounting his in-custody statements. He relies on the general notion that abusive and even threatening language does not violate a penal statute and is inadmissible under factor (b). (See *People* v. *Wright, supra,* 52 Cal.3d 367, 425-426, and cases cited.) Defendant also argues that evidence of other circumstances surrounding the outbursts was not independently admissible, e.g., thrown liquid, torn pants, unrelated "match bomb" incidents, and defendant's maximum security status.

Some of these *Boyd* claims have been waived. At trial, defendant challenged the "threat" testimony given by Heron and Roberts, but did not repeat the objection when the admissibility of Bron's testimony was raised later in the proceedings. Defendant also did not make and preserve objections to any other details described by these witnesses.

On the merits, we disagree with the Attorney General's claim that the threats violated section 71, which prohibits certain threats against public employees.[8] There was no substantial showing that defendant harbored the requisite intent—interfering with the performance of official duties—or that his statements had the requisite effect—creating a reasonable belief the threat would be carried out. (*People* v. *Boyd, supra,* 38 Cal.3d 762, 777.) Defendant had no apparent history of attacking or injuring CYA officials, and the recipients of these threats indicated they did not actually fear for their safety. Defendant was locked in his cell for the night when he harassed the two women, and his response to Bron's criticism was obviously intended as an angry retort.

We are also not persuaded by the Attorney General's attempt to characterize the act of throwing liquid in Heron's presence as an assault and battery. Nothing in the record suggests the liquid touched her or was even thrown in her direction. (Compare *People* v. *Pinholster, supra,* 1 Cal.4th 865, 961 [act of throwing urine in deputy's face is admissible under factor (b)].) This incident, like the damaged pants seized by Bron, can only reasonably be construed as inadmissible property damage. (*People* v. *Boyd, supra,* 38

---

[8]Section 71 provides that "[e]very person who, with intent to cause, attempts to cause, or causes, . . . any public officer or employee to do, or refrain from doing, any act in the performance of his duties, by means of a threat, directly communicated to such person, to inflict an unlawful injury upon any person or property, and it reasonably appears to the recipient of the threat that such threat could be carried out," is guilty of a crime.

Cal.3d 762, 776-777.) In addition, Bron's reference to "match bomb" injuries inflicted by other inmates was irrelevant absent any evidence connecting defendant to these events. The "maximum security" status described by the two female witnesses did not provide context for any other admissible act.

Nevertheless, the foregoing testimony was harmless. At most, it suggested defendant had difficulty submitting to authority and controlling his violent impulses. The jury could draw the same unfavorable character inferences from evidence properly admitted in aggravation. The circumstances of the capital- crime included defendant's attempt to kill four bar patrons in a gratuitous and cold-blooded manner. Admissible background evidence also showed a pattern of nonconforming and violent behavior, namely three assaults and the possession of potentially dangerous weapons while in custody. At least two of the assaults were unprovoked, two occurred in the presence of CYA officials, and one was incidental to a robbery. There is no reasonable possibility the penalty verdict would have been different absent evidence of threats and insults against CYA personnel.

## C. "Other-crimes" Instruction

The court gave the standard instruction prohibiting the jury from considering other violent crimes admitted in aggravation under factor (b) unless they had been proven beyond a reasonable doubt. The instruction did not describe or otherwise identify any of the acts to which it might apply. Both the prosecutor and defense counsel requested and approved the instruction as given.[9]

Defendant claims the trial court erred in not including in the instruction the names and elements of the crimes offered by the prosecution under factor (b). Defendant argues that, absent such a "frame of reference," the jury might have improperly based their penalty determination on acts which were not criminal or violent or which had not been proven to the requisite level of certainty. Defendant claims his constitutional rights to due process and a reliable penalty determination were violated as a result.

However, as defendant seems to concede, it was settled even before the penalty trial in this case that the trial court has no sua sponte duty to instruct

[9]The instruction said, in full: "Evidence has been introduced for the purpose of showing that defendant Tuilaepa has committed criminal acts which involved the express or implied use of force or violence or the threat of force or violence. Before you may consider any of such criminal acts as an aggravating circumstance in this case, you must first be satisfied beyond a reasonable doubt that the defendant did in fact commit such criminal acts. You may not consider any evidence of any other criminal acts as an aggravating circumstance." (See CALJIC No. 8.84.1.2 (1983 new).)

in the manner now urged. (*People* v. *Hardy* (1992) 2 Cal.4th 86, 205-207 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1075 [5 Cal.Rptr.2d 230, 824 P.2d 1277]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 281-282 [221 Cal.Rptr. 794, 710 P.2d 861]; *People* v. *Phillips* (1985) 41 Cal.3d 29, 68 & 72-73, fn. 25 [222 Cal.Rptr. 127, 711 P.2d 423].) The rule recognizes that, for tactical reasons, defendants in the vast majority of cases do not want to risk highlighting prior violent crimes or alienating the jury with hypertechnical defenses to bad acts which otherwise seem clearly aggravating. Hence, in the absence of a request from the defense, the court did not err in failing to give a more detailed factor (b) instruction.

Defendant claims counsel's failure to request such an instruction amounted to ineffective assistance. However, nothing in the record indicates counsel lacked a plausible tactical reason for failing to request additional instruction on aggravating crimes and elements. (*People* v. *Pope* (1979) 23 Cal.3d 412, 426, fn. 16 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) To the contrary, the record suggests counsel sought to deemphasize the significance of defendant's misconduct while in CYA custody. Counsel stressed in closing argument that defendant had no prior felony convictions, and that any unadjudicated CYA violations might have been "distasteful" but were forgivable given defendant's youth at the time. Defendant has not met his burden of establishing constitutionally deficient representation in counsel's failure to request an instruction highlighting the conduct the jury could consider under factor (b).

In any event, we reject defendant's claim that he was prejudiced by the lack of such an instruction. Our review of the record discloses convincing evidence of all criminal conduct properly admitted under factor (b)—the fight with inmate Gages, the unprovoked assault on another ward outside the infirmary, the assault and robbery of inmate Chatters, and the possession of potentially dangerous weapons while in CYA custody. There is no indication that an instruction on specific crimes and elements would have changed the jury's assessment of evidence admitted under factor (b) or would have affected the outcome at trial.

## D. *Instruction on Sentencing Discretion*

The court gave the 1986 version of CALJIC No. 8.84.2. The instruction explains the manner in which the jury is to weigh the aggravating and mitigating circumstances and select the appropriate punishment, and was drafted in response to *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]). ▮ At issue here

is a portion of the instruction saying that "[to] return a judgment of death, each [juror] must be persuaded that the aggravating evidence is *so substantial* in comparison with the mitigating [evidence] that it warrants death instead of life without parole." (Italics added.)[10] On its written verdict form, the jury specifically found that aggravation "substantially outweigh[ed]" mitigation.

Defendant notes that the instruction, as given, did not contain language from section 190.3 saying that the jury "shall impose" life imprisonment if it finds mitigation outweighs aggravation. Defendant argues that omission of this language and the alleged ambiguity of the "so substantial" language gave the jury unfettered discretion to impose death. He insists these instructional features violated the due process, ex post facto, and cruel and unusual punishment clauses of the federal and state Constitutions.

We disagree. As noted, the instruction used language suggested by *People v. Brown, supra,* 40 Cal.3d 512, 541-542, footnote 13. There, we noted that because aggravating and mitigating circumstances are weighed in the context of determining which of the law's two most serious penalties applies, the jury must understand that the decision is not whether the "bad" evidence outweighs the "good" but whether defendant is deserving of the most severe punishment—death. Consistent with *Brown,* the instructional language makes manifestly clear that death may be imposed *only* where aggravation "so substantially" outweighs mitigation that death, rather than life imprisonment, is appropriate. The converse principle emphasized by defendant here—that the jury must impose life imprisonment in all other circumstances—is obvious, and no reasonable jury could have been misled in this regard.

We used the same reasoning to reject a similar attack on the same instructional language in *People v. Duncan* (1991) 53 Cal.3d 955, 978 [281

---

[10]The instruction stated, in full: "It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without possibility of parole, shall be imposed on the defendant. [¶] After having heard all of the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed. [¶] The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole. [¶] You shall now retire and select one of your number to act as foreman, who will preside over your deliberations. In order to make a determination as to the penalty, all twelve jurors must agree." (See CALJIC No. 8.84.2 (1986 rev.).)

Cal.Rptr. 273, 810 P.2d 131]. Defendant asks us to reconsider *Duncan*, but we see no reason to do so. We conclude the jury was properly instructed on the scope of its sentencing discretion.

### E. *Constitutionality of the Death Penalty Law*

■ Defendant broadly attacks the constitutionality of section 190.3, which enumerates the factors deemed relevant to the capital sentencing determination. Defendant argues that submission to the penalty jury of factors (a) (circumstances of the capital crime), (b) (other violent criminal activity), and (i) (defendant's age at time of crime), without further clarifying language not identified here, precludes a meaningful and guided distinction between those murders that warrant the death penalty and those that do not.[11] Assuming without deciding that section 190.3 is subject to such "vagueness" concerns (see *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130]), we reject this claim.

It is settled that the "facts and circumstances of the defendant, his background, and his crime" are relevant to the sentencing decision (*Clemons* v. *Mississippi* (1990) 494 U.S. 738, 748 [108 L.Ed.2d 725, 738, 110 S.Ct. 1441]), and that the state, within certain limits, has broad latitude to decide how such facts are to be presented and considered at the penalty phase (*Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 735, 111 S.Ct. 2597]; *Boyde* v. *California* (1990) 494 U.S. 370, 377 [108 L.Ed.2d 316, 326, 110 S.Ct. 1190]). By the same token, the individualized penalty determination required by the Eighth Amendment makes inevitable application of the sentencer's own values, perceptions, and experiences to the factors the state properly deems relevant. (*Eddings* v. *Oklahoma* (1982) 455 U.S. 104, 110-112 [71 L.Ed.2d 1, 8-9, 102 S.Ct. 869].)

As we very recently held, the language of factor (a), concerning the "circumstances of the [capital] crime," embodies a consideration that the United States Supreme Court itself has identified as "one of the criteria upon which the jury *should* base its penalty determination," and withstands the type of vagueness challenge raised here. (*People* v. *Proctor, ante,* 499, 551 [15 Cal.Rptr.2d 340, 842 P.2d 1100], and cases cited.) Factor (b) focuses the sentencer's attention on other crimes (i.e., punishable offenses) committed

---

[11]Section 190.3 provides in pertinent part: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . . [¶] (b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence. . . . [¶] (i) The age of the defendant at the time of the crime."

by the defendant involving his use or threatened use of force against any person. (*People* v. *Phillips* (1985) 41 Cal.3d 29, 72 [222 Cal.Rptr. 127, 711 P.2d 423]; *People* v. *Boyd* (1985) 38 Cal.3d 762, 776 [215 Cal.Rptr. 1, 700 P.2d 782].) Factor (i) directs the sentencer to consider whether the defendant's age at the time of the capital crime gives rise to inferences about his relative youth or maturity which in "common experience or morality . . . might reasonably inform the choice of penalty . . . ." (*People* v. *Lucky, supra*, 45 Cal.3d 259, 302.)

By their express terms, factors (a), (b), and (i) thus direct the sentencer's attention to specific, provable, and commonly understandable facts about the defendant and the capital crime that might bear on his moral culpability. Having met these standards of relevance and specificity, factors (a), (b), and (i) are not "illusory" or otherwise impermissibly "vague" (*Stringer* v. *Black, supra*, 503 U.S. __, __ [117 L.Ed.2d 367, 382]) simply because they leave the sentencer free to evaluate the evidence in accordance with his or her own subjective values.

Defendant also argues that the 1978 death penalty statute is unconstitutional because it lacks adequate safeguards to protect against "arbitrary" death judgments and ensure "guided" sentencing discretion. He concedes we have implicitly or explicitly rejected all of his claims before, but asks us to reconsider our conclusions. (See, e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].) We affirm that, contrary to defendant's contentions:

1. The jury need not employ the beyond-a-reasonable-doubt standard in deciding whether aggravating factors (other than violent criminal conduct) are present, whether aggravation outweighs mitigation, and whether death is the appropriate sentence;

2. The jury need not make written findings or agree unanimously on the presence of aggravating factors;

3. The jury need not be instructed to presume that life without possibility of parole is the appropriate sentence;

4. Existing appellate procedures provide for adequate review of a death judgment.

## V. Disposition

The judgment is affirmed in its entirety.

Lucas, C. J., Panelli, J., Arabian, J., and George, J., concurred.

**MOSK, J.**—I concur in the judgment. After review, I have found no reversible error or other defect.

I write separately to make two points, one specific to this case and the other of more general applicability.

The first concerns defendant's appointed trial counsel, an attorney who is no stranger to this court. (See, e.g., *People* v. *Wilson* (1992) 3 Cal.4th 926 [13 Cal.Rptr.2d 259, 838 P.2d 1212]; *In re Wilson* (1992) 3 Cal.4th 945 [13 Cal.Rptr.2d 269, 838 P.2d 1222].) To my mind, counsel's performance was deficient in many regards. That is to say, it failed to satisfy an objective standard of professional reasonableness. Nevertheless, his failings did not subject the defense to prejudice. No reasonable probability exists that a more favorable outcome would have resulted in their absence. Hence, counsel's assistance was not ineffective under either the Sixth Amendment to the United States Constitution or article I, section 15 of the California Constitution. (See generally *People* v. *Ledesma* (1987) 43 Cal.3d 171, 215-218 [233 Cal.Rptr. 404, 729 P.2d 839] [discussing both federal and state constitutional provisions].)

The second point relates to defendant's claim under *Stringer* v. *Black* (1992) 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130] (*Stringer*). As I stated in my dissenting opinion in *People* v. *Proctor, ante,* at page 499 [15 Cal.Rptr.2d 340, 842 P.2d 1100]:

"In *Stringer*, the United States Supreme Court held that 'if a State uses aggravating factors in deciding who shall be eligible for the death penalty or who shall receive the death penalty, it cannot use factors which as a practical matter fail to guide the sentencer's discretion' in contravention of the Eighth Amendment. [Citation.] It explained: 'Although our precedents do not require the use of aggravating factors, they have not permitted a State in which aggravating factors are decisive to use factors of vague or imprecise content. A vague aggravating factor employed for the purpose of determining whether a defendant is eligible for the death penalty fails to channel the sentencer's discretion. A vague aggravating factor used in the weighing process is in a sense worse, for it creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance.' [Citation.] Of course, California uses 'aggravating factors'—labeled 'special circumstances' [citation]—to determine death eligibility. It also uses 'aggravating factors'—bearing that very label [citation]—to decide between life and death.

"A narrow *Stringer* challenge could specifically attack any one or more of the factors set out in the standard jury instruction on the determination of

penalty as vague and, for that reason, likely to invite an arbitrary and capricious choice of punishment in violation of the Eighth Amendment. . . .

"A broader *Stringer* challenge could generally attack the standard jury instruction on the determination of penalty as vague at its very core and, for that reason, highly likely to invite an arbitrary and capricious choice of punishment in violation of the Eighth Amendment." (*People* v. *Proctor, supra, ante,* at pp. 566-567 (dis. opn. of Mosk, J.).)

Defendant's *Stringer* challenge is narrow. He attacks factor (a), the "circumstances of the crime"; factor (b), the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"; and factor (i), the "age of the defendant at the time of the crime."

At the outset, the majority "[a]ssum[e] without deciding" that the factors set out in the standard jury instruction on the determination of penalty are subject to attack for vagueness under *Stringer.* (Maj. opn., *ante,* at p. 594.) That "assumption" is unnecessary. The United States Supreme Court has all but expressly decided the issue. The factors *are* subject to attack. (See *Bacigalupo* v. *California* (1992) 506 U.S. __ [121 L.Ed.2d 5, 113 S.Ct. 32], vacating and remanding *People* v. *Bacigalupo* (1991) 1 Cal.4th 103 [2 Cal.Rptr.2d 335, 820 P.2d 559], for further consideration in light of *Stringer* v. *Black, supra,* 503 U.S. __ [117 L.Ed.2d 367, 112 S.Ct. 1130].)

The majority then proceed to reject defendant's *Stringer* challenge. They do so because they themselves do not find factors (a), (b), and (i) to be vague. But "[w]hat is dispositive is not what jurists on appellate courts may announce, but what laypersons on juries may understand." (*People* v. *Proctor, ante, supra,* at p. 567 (dis. opn. of Mosk, J.).) In this regard, consider factor (i). We have held that "age" can be aggravating or mitigating or neither depending on the peculiar facts of the individual case. (E.g., *People* v. *Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Whether a juror would come to the same conclusion, however, is another matter.

In the course of their analysis, the majority appear to suggest that if a factor is not vague, it necessarily passes muster under the United States Constitution, even if it "leave[s] the sentencer free to evaluate the evidence in accordance with his or her own subjective values." (Maj. opn., *ante,* at p. 595.) Such a proposition would be too broad. The requirements imposed by the federal charter are substantive as well as formal. Thus, a factor, no matter

how clearly defined, is constitutionally invalid if, for example, it authorizes or allows a juror to "attach[] the 'aggravating' label to" matters "that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race, religion, or political affiliation of the defendant" or "to conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness." (*Zant* v. *Stephens* (1983) 462 U.S. 862, 885 [77 L.Ed.2d 235, 255, 103 S.Ct. 2733].)

With that said, I note that a successful *Stringer* challenge does not automatically result in reversal. As *Stringer* itself makes plain, an instruction incorporating a vague factor is subject to harmless-error analysis. (503 U.S. at pp. __, __ [117 L.Ed.2d at pp. 379, 383, 112 S.Ct. at pp. 1137, 1140].) On this record, even if one or more of the factors defendant attacks are deemed vague, no prejudice appears.

In conclusion, having found no reversible error or other defect, I concur in the judgment.

**KENNARD, J.**—I concur in the result and the reasoning of the majority opinion except for its conclusion that, assuming we must evaluate the aggravating factors in Penal Code section 190.3 to determine whether they are impermissibly vague in violation of the Eighth Amendment, factor (i) ("the age of the defendant at the time of the crime") is not vague. I see no need to resolve this issue here. Because defendant's age played little role in either the evidence or the argument at the penalty phase, any vagueness in the trial court's instruction to the jury on factor (i) was harmless under any standard.

Appellant's petition for a rehearing was denied March 10, 1993.