Filed 9/23/14  P. v. Quinteros CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063547 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCS245331) |
| LIONEL ALVIDREZ QUINTEROS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Affirmed.

Avatar Legal and Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

This case arose out of crimes committed by a group of inmates—some of whom were members of the Mexican Mafia prison gang—against a fellow inmate in a prison yard. In an amended information, Lionel Alvidrez Quinteros and two codefendants[1]—Alberto Macias and Geronimo Polina[2]—were charged with three felony offenses: (1) conspiracy to commit murder (count 1: Pen. Code,[3] §§ 182, subd. (a)(1)); (2) attempted murder (count 2: §§187, subd. (a), 664); and (3) assault with a deadly weapon by a prisoner (count 4: § 4501). As pertinent here, the amended information also alleged that Quinteros committed each crime for the benefit of, at the direction of, or in association with a criminal street gang within the meaning of 186.22, subdivision (b)(1); and that he had suffered four prior strike convictions within the meaning of the Three Strikes law (§§ 667, subds. (b)-(i), 1170.12, 668).

During the jury trial—after Quinteros, Macias, and Polina rested and while the prosecution was presenting the testimony of a rebuttal witness—Macias pulled out a concealed razor blade and slashed his attorney on the cheek in the presence of the jury. The court individually questioned in camera the 12 jurors and three alternate jurors, and

---

[1] Four codefendants were originally charged in this matter along with Quinteros: Eduardo Alberto Macias, Geronimo Polina, Jose Manuel Garcia, Juan Gabriel Morones, and Francisco Daniel Valencia. At some point Valencia pleaded guilty and Garcia and Morones's trial was severed. The remaining defendants—Quinteros, Macias, and Polina—were jointly tried.

[2] Neither Macias nor Polina is a party to this appeal.

[3] All further statutory references will be to the Penal Code unless otherwise specified.

then excused two jurors and replaced them with alternate jurors. Quinteros's trial counsel moved for a mistrial and joined in codefendant Polina's motion to sever. The court denied those motions.

The jury found Quinteros guilty of assault with a deadly weapon by a prisoner (count 4), but acquitted him of the remaining charges (conspiracy to commit murder & attempted murder). The jury found the gang allegations to be not true.

Quinteros's counsel brought a motion for new trial, claiming that Quinteros's presumption of innocence and his right to a fair trial were taken away by Macias's violent act in front of the jury. The court denied Quinteros's new trial motion.

During the sentencing hearing, Quinteros admitted all four prior strike allegations were true. The court then sentenced Quinteros for his count 4 conviction to the middle state prison term of four years, doubled to eight years under the Three Strikes law.

*Contentions*

Quintero appeals, raising four contentions. First, he contends he was denied his federal constitutional right to a fair trial by 12 impartial jurors, and thus his conviction must be reversed because (1) the jury was exposed to several inherently prejudicial influences as a result of codefendant Macias's courtroom attack on Macias's attorney, and (2) juror No. 2, who was not excused following the courtroom attack, exhibited actual bias in that, when he was interviewed by the court after the incident, "he never said he could remain impartial and his answers indicated a substantial likelihood of bias from witnessing the attack."

3

Second, Quinteros contends the court abused its discretion when it found the courtroom attack did not warrant a mistrial or new trial because it failed to consider whether the courtroom attack was inherently prejudicial under an objective standard.

Third, he contends his conviction must be reversed because the court prejudicially abused its discretion and violated his federal constitutional right to due process by (1) ordering that he be restrained during trial and (2) allowing him to be visibly restrained and handcuffed in front of the jury during a hearing following Macias's attack on his attorney.

Last, Quinteros contends the $154 booking fee the court imposed under Government Code section 29550.1, subdivision (a) was unauthorized and must be reversed, and the matter must be remanded for imposition of the correct fee under Government Code section 29550.2, because Quinteros was arrested by a state agency─the California Department of Justice─rather than by a local agency.

For the reasons stated, *post*, we affirm the judgment.

## FACTUAL BACKGROUND

A. *The People's Case*

Victoriano "Cyco" Ortiz testified both as the victim of the July 5, 2010 attack in the prison yard at the Richard J. Donovan Correctional Facility (hereafter referred to as Donavan or Donovan Prison) that is the subject of this case, and as an expert on the Mexican Mafia. Ortiz, who had been a member of the Brole gang in Brawley, California,

became an associate[4] in the Mexican Mafia. He was incarcerated at Donovan after he was convicted in 2010 of committing an assault in El Centro for the benefit of the Mexican Mafia.

Ortiz indicated that the Mexican Mafia exerts its control inside California prisons and jails and over Southern California Hispanic street gangs. Members of Hispanic street gangs in Southern California are called "Southsiders." The Mexican Mafia is in charge of the Southsiders. A "Sureño" is a full-fledged "soldier" who is very loyal to the Mexican Mafia. To become a Sureño one must assault somebody in prison or do something that shows his alliance and respect to the Mexican Mafia.

Ortiz testified that the Mexican Mafia communicates to inmates through letters. These letters give inmates authority to "run" the prisons, collect "taxes," and "do whatever has to be done" inside the prisons. To show their respect to the Mexican Mafia, Southsiders must pay "taxes" to the Mexican Mafia in the amount of one-third of all of the proceeds of their illegal activity.

Ortiz also testified that if a street gang fails to pay their respects to the Mexican Mafia, they can get "greenlighted," which means the members of the gang will be beaten or stabbed when they arrive in prison depending on how "hard" the greenlight is. According to Ortiz, members of the Mexican Mafia commit "[a]ssaults, stabbings, shootings, kidnappings, torture, anything that they have to" in order to "get the point across that the Mexican Mafia is and will be respected." The members commit crimes to

---

4    Ortiz testified that an associate is somebody who has been "validated" and has "a lot of authority and power . . . for the Mexican Mafia."

collect their money, often by extortion. In the prison, a module contains about 20 cells, and each module is run by a "key holder" who is in charge of collecting the taxes for the Mexican Mafia.

Ortiz testified that when he arrived at Donovan, he believed he had permission to run Donovan based on verbal and written authority that Mexican Mafia member Richard Buchanan gave him. Ortiz established a "mesa" (his team or executive committee) with three other Donovan inmates: Isaac ("Lazy") Ballesteros; Quinteros's codefendant, Polina ("Blue"); and Manuel ("Stomper") Gonzalez. Before July 2, 2010, Quinteros's codefendant, Macias, a Sureño whom Ortiz knew as "Funny Boy," was also loyal to Ortiz. Ortiz testified that Quinteros, a Southsider whom Ortiz knew as "Chuco," wanted to become loyal to Ortiz's mesa and told Ortiz he would do whatever Ortiz asked.

According to Ortiz, a power struggle arose when another inmate, "Casper from Fallbrook,"[5] failed to recognize Ortiz's authority. In an attempt to "come together in agreement," Ortiz tried sending written "kites"[6] to Casper indicating that Buchanan had given him authority to run the prison. Ortiz directed Ballesteros to write a kite telling Casper that he and Ortiz needed to "settle up," but Casper refused to do so.

_____

[5]     Pablo ("Casper") Franco.

[6]     Ortiz testified that "kites" (or "willas") are "small handwritten notes that [inmates] usually fold and roll up real small the size of a capsule. [U]sually an inmate can sneak it under his tongue, in his tooth, in his gums, or if he has to, in his private areas or his toes, or anywhere, because he gets searched." He stated that kites are "confidential communications between inmates" that "generally talk about either Mexican Mafia or prison politics."

On July 2, 2010, through a vent, Ortiz overheard a Mexican Mafia associate named Jose Manuel "Crazy Joe" Garcia, who sided with Casper, tell Ballesteros to stab or slice Ortiz and Gonzalez with razor blades. Ortiz testified that he also read some kites sent to Ballesteros stating that Crazy Joe said Stomper (Gonzalez) and Ortiz were supposed to get "hit on the next available yard, no exceptions." These kites noted that Ortiz, Polina, Ballesteros, and Gonzalez were "in the hat," which meant they had "mess[ed] up" and were "done." The word "whacked," which means killed, was used in one of the kites. Ortiz testified he was angry that Ballesteros, a member of his mesa, was being ordered to stab him.

Investigators at Donovan received information that Garcia was going to conduct some criminal activity for the Mexican Mafia at the prison. Unbeknownst to the inmates, microphones were placed in the plumbing chase between two cells where Garcia was located so that law enforcement officers could glean intelligence. In one recorded conversation, which was played for the jury, Garcia dictated a kite to his cellmate, Juan Morones, giving a direct order for the stabbing of Ortiz.

Knowing from the kites that he might get stabbed, Ortiz went outside to the prison yard on July 5, 2010, at approximately 12:20 p.m., and walked laps with Polina. Ortiz testified that as he walked and talked with Polina, he observed other inmates walking towards a corner near a toilet stall. Polina then swung his hand at Ortiz's face, and Ortiz raised his right hand to block the strike and protect his face. Ortiz felt something cutting his hand.

7

Ortiz also testified that Macias approached him and slashed his head with a razor while Quinteros punched him and held him down.[7] Another inmate named "Cobra" Valencia also assaulted Ortiz. As correctional officers fired shots of increasing lethality, Ortiz's attackers continued to assault him by punching, kicking, and stabbing him, and banging his head against a wall while he tried to cover up and defend himself. As a result of the razor slashes, Ortiz suffered cuts to his head, back, and hand. Macias flushed the razor down the toilet. (2RT 212:13-18, 240:23-26; 4RT 489:9-10, 571:23-28)! A video of the incident was played for the jury.

The parties stipulated that Quinteros was not a documented member of a criminal street gang, and he was not a validated Mexican Mafia associate.

B. *The Defense*

Quinteros's codefendant, Macias, testified that Ortiz was angry with him because a girl named Priscilla liked him. To antagonize Ortiz, Macias took a picture of himself kissing Priscilla and sent it to Ortiz. Macias testified he was not involved in a conspiracy to murder Ortiz, and he denied receiving instructions to murder him. He claimed he never received a kite about "putting a hit" on Ortiz.

Macias also testified he and Ortiz also argued because Macias was upset that Ortiz had made jokes about the fact that he had been incarcerated for beating up on a person in a wheelchair. Following this argument, Macias began carrying a razor in his mouth when he went to the prison yard. On the day of the incident, Macias saw Ortiz walking with

---

[7] Gonzalez was attacked at the same time as Ortiz.

Macias's friend, Polina. Macias testified that Ortiz took a "cheap shot" at Polina by punching him from the side. Macias removed the razor from his mouth and began "slicing" Ortiz. Macias also testified he had no intent to kill Ortiz, as the razor was small and flimsy. He stated that he flushed the razor down the toilet. He also testified that Quinteros tried to break up the fight.

Several other inmates testified in Macias's defense. Ortiz's cellmate testified that Ortiz said he was going to attack Polina. Martin Madrid testified that Ortiz told him Macias had taken his girlfriend, Priscilla, from him. Another cellmate of Ortiz's testified that Ortiz carried razor blades and was angry with Macias because of a woman. Gonzalez testified he witnessed the fight in the yard between Ortiz and Polina. He stated that Ortiz started the fight by hitting Polina. Gonzalez stated he also became involved in a mutual fight. Gonzalez testified he did not believe a hit was put on him.

DISCUSSION

I. *QUINTEROS'S CLAIM HE WAS DENIED A FAIR TRIAL BY IMPARTIAL JURORS*

Quinteros claims his conviction must be reversed because he was denied his federal constitutional right to a fair trial by 12 impartial jurors. In support of this claim, he asserts (1) the jury was exposed to several inherently prejudicial influences as a result of codefendant Macias's courtroom attack on Macias's attorney, and (2) juror No. 2, who was not excused following the courtroom attack, exhibited actual bias in that, when he was interviewed by the court after the incident, "he never said he could remain impartial and his answers indicated a substantial likelihood of bias from witnessing the attack." Quinteros's claim is unavailing.

9

A. *Background*

1. *Macias's courtroom assault on his attorney and related proceedings that day*

On December 13, 2012, after defendants Quinteros, Macias, and Polina rested their cases, the prosecution recalled Ignacio Bravo, a correctional officer at Donovan Prison, as its first rebuttal witness. As Officer Bravo was testifying, Macias slashed his attorney, William Burgener, in the face with a small razor blade he had concealed in his mouth. Burgener jumped up and exclaimed, "What the fuck did you do to me?" Macias tried to stand up but could not do so because he was bolted down. A bailiff said, "Call first aid." The bailiffs then jumped on Macias. The court said, "Everybody stay right there."

Immediately thereafter, Macias stated, "It didn't have nothing to do with you guys. Officer Bravo--" The court silenced him, stating, "Mr. Macias, you need to keep quiet." The jurors left the courtroom after the defendants were removed from the courtroom. Burgener was taken to the hospital where he received stitches for his wound.

Outside the presence of the jury, in another courtroom, the trial judge summarized what had occurred:

> "So we were in a different department, Department 25, when Officer Bravo was about to testify as a rebuttal witness for the prosecution. He was the last witness before we were going to instruct the jurors. And as soon as Mr. Bravo took the stand, Mr. Macias apparently had secreted a small—very small razor blade that had some cloth wrapped around the bottom of it, so it was probably maybe a quarter of an inch point, maybe, or maybe three-eighths of an inch point. And he slashed—I guess it was in his mouth. He took it out of his mouth and he slashed Mr. Burgener with it.

10

"[Macias] was I bolted to the floor so he couldn't get up. And so then Mr. Burgener jumped up and yelled and had blood on his face, and apparently, according to Agent Epperson,[8] had a pretty deep cut on his jawline on his right side.

"So Mr. Burgener had to go to the hospital because it looks like he might have to have stitches. He definitely needs to have that wound thoroughly cleaned. And he's no longer here today.

"But we have a jury that we swore in and listened to the entire proceedings and we were about to instruct. And so since Mr. Burgener is at the hospital and cannot be here, I wanted to have Mr. Macias represented when we decide what kind of--how we are going to proceed from here.

"And so that's why you are here, Mr. Cline.[9] And so now I don't know if you had an opportunity to talk to [Polina's attorney] or [Quinteros's attorney], but I kind of wanted to get an idea of what they think should happen next in their judgment."

At that point, Quinteros's counsel made a motion for mistrial, stating that defendant Macias's conduct in the courtroom involved "the same thing that all three defendants are charged with in this case." Polina's attorney stated he was leaning toward a mistrial motion, but first he needed to speak with his client. When Quinteros's attorney pointed out that Macias had been in the courtroom out of the presence of the jury for 30 minutes before he attacked his attorney, the prosecutor responded that Macias attacked Burgener "[o]nly after the jury was brought in[ and] only when the witness took the stand," which suggested Macias slashed his attorney "for the benefit of the jury."

---

8    Steve Epperson, a special agent at the Special Service Unit of the California Department of Corrections, had previously testified during the People's case-in-chief. Agent Epperson, who was in the courtroom at the time Macias slashed Burgener with the razor blade, assisted Burgener in the courtroom before he was taken to the hospital.

9    Attorney Steven Cline made a special appearance on behalf of Macias.

11

Indicating that the court needed to speak with Macias's attorney to determine whether he wanted to "conflict out," the prosecutor stated that Macias should not benefit from his conduct. The prosecutor suggested Macias would be entitled to a mistrial if Burgener decided he could not continue as Macias's trial counsel because "no one else is ready to represent him at this time." The prosecutor also suggested that the court question the jurors to determine whether they could be fair and that it draft a special jury instruction indicating Macias's conduct could not be used against Quinteros and Polina.

After further discussion, the prosecutor told the court he was going to "change [his] position," noting that he had consulted with a senior deputy attorney general, and he believed "Polina and [Quinteros] have a built in reversal issue because of the horrific act done by Macias." The court noted that the jury had witnessed a "slash attack" that was potentially traumatizing and upsetting for them. Stating that "we're asking a lot" of the jurors by asking them to "forget what [they] saw" and deliberate, the court commented that "we're probably going to do the mistrial route as to [Polina and Quinteros]."

After a recess, Polina's attorney indicated that he had conferred with Polina and that they "wish[ed] to continue on with the trial and finish it up." Quinteros's counsel, however, requested that the court declare a mistrial. Cline, the attorney specially appearing for Macias, stated he thought a mistrial "would be appropriate under the circumstances," but he would "defer to the court." In response, the prosecutor suggested that the court send the jury home to allow the parties to conduct research regarding the issue.

Noting that it also wished to hear from Macias's counsel, Burgener, the court declared a recess.

The court brought the jurors back into the courtroom and gave the following admonishment:

"First of all, I want to apologize for you[r] having to witness what some of you witnessed. And I also want to apologize for the inconvenience of having you all interviewed because an alleged crime occurred in your presence, and so you were witnesses to that alleged crime, so you were interviewed as witnesses.

"Now, I've been doing criminal cases, either as a lawyer or as a judge, for 30 years, and this is the first time something like this has ever happened, and so I think all--and there are countervailing constitutional rights at play here for defendants, for the prosecutor, and so most of us have not experienced something like this either, so I think we all just need to--the lawyers need to all call time out and do a little research and try to figure out how we should proceed.

"So what that means for you, is that we'd like you to return tomorrow morning at 10:00, and we're going to have a little conference between 9:30 and 10:00 with the lawyers, and then we're going to try to figure out what our next step is. So it may be that we're going forward and doing closing argument. It may be that we are declaring a mistrial and you'll all be excused. But before we figure out what the answer to some of those questions are, we need to have a little time to research it. Okay.

"So now this is going to be the hardest part of the next 22 hours, is that *you are not to form or express an opinion about this case*, you're not to discuss it among yourselves or with others, so that's really important, because I know that this incident is going to be on the news, and so if you can avoid watching the news, that would be great. It's also going to be in the paper, so please do not read a newspaper article about it, and please do not discuss it with your loved ones. Just say I can't talk about it until the trial is over.

"And I appreciate your work on this case. We're actually, before this happened, we were making very good progress, and we were going to be doing closing argument, some today and some on Friday.

13

"So we're actually way, way ahead of schedule. And so, I mean, we still have a little more time to dedicate to this case, like we told you.

"So anyway, so tomorrow morning at 10:00 o'clock in Department 25. Not here. This is our normal department, but that department is a little bit bigger and it accommodates everybody a little better.

"So you're ordered to appear tomorrow morning at 10:00 o'clock outside Department 25. And like I said, I know it's going to be really hard to compartmentalize this, but I'm going to ask you do that. And *if we do go forward with argument and deliberations, that you not let what happened in the courtroom affect what you think the evidence does or does not show about what happened at Donovan*.

"So *what happened at Donovan is what you're charged with deciding, not what happened in our courtroom*. Okay. [¶] Alright. Thank you very much. And you are excused for the day." (Italics added.)

Outside the presence of the jury, attorney Cline represented to the court that Burgener's wound did not appear to be life threatening and he was being evaluated by a plastic surgeon. Cline also stated that Burgener believed he had a conflict with Macias and he could not effectively represent him. The court then adjourned the hearing to give the parties time to conduct research.

2. *The court's in camera interviews of the jurors and alternate jurors*

The following day, December 14, the prosecution filed an opposition to the defense motion for mistrial. The prosecution urged the court, before deciding whether a mistrial should be declared, to inquire of the jurors whether they could "put the incident aside and decide this case solely on the facts as presented [at] trial and not be influenced by [Macias's] conduct." The prosecution argued that Macias's attack on his attorney

14

warranted his removal from the courtroom, and that by his actions he had forfeited his right to appointed counsel if Burgener was unable to continue representing him.

At the follow-up hearing that day, outside the presence of the jury, attorney Burgener told the court he was prepared to go forward with closing arguments on behalf of Macias. In response to the court's inquiry, the prosecutor informed the court that any prosecution of Macias for his courtroom behavior would be handled by the Attorney General's Office. The prosecutor argued that the incident in the courtroom did not necessarily create a conflict between Burgener and Macias and that it was "allowable and appropriate" for Burgener to continue representing Macias.

The trial court then indicated it believed Burgener had an actual conflict with Macias, notwithstanding Burgener's willingness to continue with the trial, and despite the prosecutor's argument to the contrary. Cline, who again was specially appearing on behalf of Macias, told the court he also believed that an actual conflict existed between Burgener and Macias and then represented that Macias did not believe he could work with Burgener. Burgener reiterated that he was "happy to go forward" despite the fact he had received several fine stitches along his jawline.

The court then held an in camera *Marsden*[10] hearing with Macias, Burgener, and Cline to determine whether Burgener should continue representing Macias. Following the hearing, the court relieved Burgener as Macias's counsel. The court also found that Macias had forfeited his right to appointed counsel, indicating that Macias should not

---

[10] *People v. Marsden* (1970) 2 Cal.3d 118.

benefit from his own wrongdoing. The court appointed Cline as Macias's standby counsel. The court then stated it would conduct an in camera hearing with each individual juror to determine whether he or she could be fair and impartial, and then it would address any mistrial motions by the defendants.

During the in camera hearing, the court, with counsel present, individually and privately questioned each of the 12 jurors and three alternate jurors outside the presence of the defendants and the other jurors. The court generally asked each juror four questions: (1) whether the juror could put aside what the juror saw, and fairly and impartially evaluate the evidence; (2) whether the juror could not let what the juror saw affect how he or she looked at Quinteros and Polina, given that neither of these defendants was involved in the incident; (3) whether the juror could fairly and impartially set aside what they saw with regard to defendant Macias and decide the charges based on what Macias allegedly did on the date of the charged incident; and (4) whether the juror was interviewed by the sheriff.

As pertinent here, jurors Nos. 1, 3, 4, and 7 through 15 indicated that they were able to put aside their observations of the Macias incident and fairly and impartially evaluate the evidence, and that the incident would not influence how they viewed the evidence against Quinteros, Polina, and Macias.

Juror No. 2, when asked the first question, stated: "My feeling is yes, but I think if once we adjourn to go through the case, we'll be doing a lot of talking." The court indicated that the conversation should not be about what happened in court between Macias and Burgener, and juror No. 2 replied, "I understand." When the court asked

16

juror No. 2 whether he could abide by an instruction not to consider what had happened in court, he indicated he could do so. Juror No. 2 then indicated he would "certainly try" to not let the incident affect his deliberations with regard to Quinteros and Polina, but indicated that "there's got to be an effect" and noted that he observed "a young man that had a very bad temper." The court asked juror No. 2 whether—as to Macias—he could set aside what happened in court and decide the case on what was said on the witness stand. Juror No. 2 replied, "Yes, we could go through our notes and tally it up and figure what's correct."

Jurors Nos. 5 and 6 indicated they did not believe they could be fair and impartial after observing Macias's conduct. The court excused those jurors and replaced them with alternate jurors.

a. *Quinteros's mistrial motion*

Following the in camera interviews of the jurors, and out of the presence of the jury, Quinteros and Polina renewed their mistrial motions. Quinteros's counsel argued that Macias, by cutting his attorney with a razor in the courtroom, painted Quinteros and Polina in a bad light, although they were not involved in that incident. He also indicated the Macias incident undermined Quinteros's trial defense of downplaying Ortiz's injuries. Quinteros's counsel also argued the jurors could not put the courtroom incident aside even if they said they could.

The court noted that 13 of the 15 jurors interviewed said they could be fair and impartial and could set aside what happened, while the two who said they could not were excused. The court stated it did not see how the Macias incident undercut any argument

17

Quinteros intended to make as to the severity of Ortiz's injuries. The court also noted that both Quinteros and Polina sat still during the Macias incident, they appeared to be unaware that Macias was going to do what he did to Burgener, and the jurors indicated they would not hold Macias's actions against Quinteros and Polina.

Following further discussion the court denied the motions for mistrial, reiterating that the jurors indicated they could be fair and impartial and the court had to "take them at their word" and "trust them."

3. *Special jury instructions*

Prior to deliberations, the jury was instructed that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jury the following special limiting instruction:

> "Your task is deciding what occurred on July 5th, 2010, at R.J. Donovan state prison. Once you agree . . . on what the facts are in this case, you are to apply the law set forth in these instructions to those facts.
>
> "Ultimately, you will decide whether this case has been proven beyond a reasonable doubt. If it has not been proven beyond a reasonable doubt, you must find the defendants, or any individual defendant against whom the case has not been proven, not guilty.
>
> "*In reaching your determination, you are not to consider anything that you observed, or heard in the courtroom on December 13, 2012. Those events should not enter into or affect your deliberations in any way*." (Italics added.)

4. *Jury deliberations, verdicts, and denial of Quinteros's new trial motion*

After about four and a half hours of deliberations, the jury found Quinteros guilty of assault with a deadly weapon by a prisoner (§ 4501), but found him not guilty of

18

conspiracy to commit murder and attempted murder. The jury found the related gang allegations to be not true. The jury found Macias and Polina guilty on all three counts.

Quinteros thereafter filed a motion for new trial asserting that his presumption of innocence and his right to a fair trial were taken away by Macias's violent act in front of the jury. The court denied the motion at the sentencing hearing, stating:

> "That was not the case. The jurors didn't even find a gang allegation, and they only convicted your client of assault on a prison inmate and nothing else. They didn't convict him of conspiracy. They didn't convict him of a gang allegation. So I think all the things you are concerned about prove to not occur because of the way the verdicts ended up as to your client."

B. *Applicable Legal Principles*

Under the Sixth and Fourteenth Amendments to the United States Constitution and article I, section 16 of the California Constitution, "[a]n accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is '"capable and willing to decide the case solely on the evidence before it."'" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294 (*Hamilton*).)

Although "[a] sitting juror's involuntary exposure to events outside the trial evidence" (*Hamilton, supra,* 20 Cal.4th at pp. 294-295) is not misconduct in the pejorative sense, it may still lead to juror bias. (*Ibid*.) Such exposure gives rise to a rebuttable presumption of prejudice. (*People v. Danks* (2004) 32 Cal.4th 269, 307.)

Whether an individual verdict must be overturned as a result of such juror exposure or irregularity "'"is resolved by reference to the substantial likelihood test, an

19

objective standard.'"'" (*Hamilton*, *supra*, 20 Cal.4th at p. 296.) In *Hamilton*, the California Supreme Court held that "[a]ny presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Ibid.*) In so holding, the high court explained that "[t]he standard is a pragmatic one, mindful of the 'day-to-day realities of courtroom life' [citation] and of society's strong competing interest in the stability of criminal verdicts [citations]. It is 'virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.' [Citation.] Moreover, the jury is a 'fundamentally human' institution; the unavoidable fact that jurors bring diverse backgrounds, philosophies, and personalities into the jury room is both the strength and the weakness of the institution. [Citation.] '[T]he criminal justice system must not be rendered impotent in quest of an ever-elusive perfection. . . . [Jurors] are imbued with human frailties as well as virtues. *If the system is to function at all, we must tolerate a certain amount of imperfection short of actual bias.*' " (*Ibid.*, italics added.)

In *People v. Cissna* (2010) 182 Cal.App.4th 1105 (*Cissna*), this court explained that "[w]hen . . . juror misconduct arises from a juror's receipt of extraneous information, juror bias can be inherent or circumstantial. [Citations.] Under the *inherent* bias test, the court considers whether the 'extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror.' [Citations.] Even when the extraneous information is not so prejudicial, in and of itself, as to cause inherent bias, under the

20

*circumstantial* bias test the court must examine the totality of the circumstances surrounding the misconduct to determine whether a substantial likelihood of actual bias nonetheless arose. [Citations.] The judgment must be set aside if the court finds prejudice under either the inherent or circumstantial bias test." (*Id.* at pp. 1116-1117, italics added.)

1. *Standard of review*

On appeal from a ruling denying a new trial motion based on a claim the defendant was prejudiced by a juror's misconduct or "exposure to events outside the trial evidence" (*Hamilton, supra,* 20 Cal.4th at pp. 294-295), "we defer to the trial court's factual findings if supported by substantial evidence, and exercise our independent judgment on the issue of whether prejudice arose from the misconduct (i.e., whether there is a substantial likelihood of inherent and/or circumstantial juror bias)." (*Cissna*, *supra*, 182 Cal.App.4th at p. 1117, citing *People v. Nesler* (1997) 16 Cal.4th 561, 582 & fn. 5; see *People v. Ault* (2004) 33 Cal.4th 1250, 1263-1264.)

C. *Analysis*

1. *Jury's exposure to Macias's attack on his attorney*

Applying the inherent bias test, we first conclude that codefendant Macias's courtroom attack on his attorney, judged objectively, was not so prejudicial, in and of itself, as to cause inherent juror bias against Quinteros such that Quinteros was denied his constitutional right to a trial by an impartial jury. Nothing in the trial record suggests that Quinteros played a role in the attack or made any comments or gestures before, during, or after the attack that reasonably could be construed as either encouragement to Macias or

21

approval of what he did. When the court heard Quinteros's mistrial motion, the court—outside the presence of the jury—observed that Quinteros and his other codefendant, Polina, "didn't try to get up, they didn't try to do anything. They didn't encourage Mr. Macias. They acted as if they didn't know that this was going to occur." The court observed that Burgener did not bleed very much, and the jury didn't see any bleeding because Agent Epperson quickly put a compression hold on Burgener's cheek. We defer to the court's factual findings. (*Cissna*, *supra*, 182 Cal.App.4th at p. 1117.)

Quinteros, however, asserts that Macias's attack on Burgener was inherently prejudicial to him (Quinteros) because, given the nature of the nature of the attack on Ortiz in the prison yard, "it mattered whether the jury believed he was a peacemaker or was just another violent thug." This assertion is unavailing because, although Quinteros did not act as a peacemaker during Macias's attack on Burgener, he acted as if Macias committed the violent act on his own.

Applying the circumstantial bias test and examining the totality of the circumstances surrounding Macias's courtroom attack on his attorney, we conclude Quinteros has failed to meet his burden of showing that a substantial likelihood of actual juror bias against him arose as a result of that incident. When the jurors were brought back into the courtroom following the incident, the court admonished them that if the case proceeded to closing arguments and deliberations, they must "not let what happened in the courtroom affect what [they] think the evidence does or does not show about what happened at Donovan." The court then reiterated that they were charged with deciding "what happened at Donovan . . . , not what happened in our courtroom."

22

In addition, the court found that all but two of the jurors were able to put aside their observations of Macias's attack on his attorney and fairly and impartially evaluate the evidence. The court excused those two jurors and replaced them with alternate jurors.

Furthermore, the court repeatedly instructed the jury that the courtroom attack on Burgener by Macias must play no role during deliberations and that it must decide the case based only on the evidence presented in the courtroom. The court also gave the jurors a special limiting instruction admonishing them that they were "not to consider anything [they] observed" in the courtroom during the attack, and that "[t]hose events should not enter into or affect [their] deliberations *in any way*." (Italics added.) Because Macias had been handcuffed after the attack, the court instructed the jury not to consider this fact for any purpose and to not discuss it during deliberations.

We presume the jurors understood and followed the court's instructions (*People v. Brady* (2010) 50 Cal.4th 547, 566, fn. 9), and there is nothing in the record to rebut this presumption. On the contrary, the jury's verdicts strongly indicate the jury followed the court's instructions. While the jury found both Macias and Polina guilty of all three offenses charged in the amended information, it acquitted Quinteros of the two most serious charges: conspiracy to commit murder and attempted murder. The jury also found the gang allegations charged against Quinteros to be not true. These verdicts, viewed objectively in light of the totality of the circumstances, belie Quinteros's claim that his conviction of assault with a deadly weapon by a prisoner should be reversed on the ground a substantial likelihood of actual bias against him arose as a result of Macias's courtroom attack on his attorney.

23

2. *Juror No. 2*

Quinteros, however, contends his conviction should be reversed because the record shows juror No. 2, who was not excused following Macias's attack on Burgener, exhibited actual bias against him. Specifically, he contends juror No. 2 "never said he could remain impartial and his answers indicated a substantial likelihood of bias from witnessing the attack." These contentions are unavailing.

Juror No. 2's responses to the court's in-camera questioning (discussed, *ante*) do not show juror No. 2 exhibited actual bias against Quinteros. Again, the jury's verdicts convicting Macias and Polina of all three counts but acquitting Quinteros of the two most serious offenses and finding to be not true the gang allegations against him show that juror No. 2 exhibited no such bias against Quinteros.

3. *Officer Bravo's and Agent Epperson's responses to the courtroom attack*

Quinteros also contends the quick response to the emergency by prosecution witnesses Officer Bravo and Agent Epperson immediately after Macias attacked Burgener was substantially likely to cause pro-prosecution bias because "it created a credibility-bolstering, favorable impression of the prosecution team that was unrelated to the evidence presented." Citing *Turner v. Louisiana* (1965) 379 U.S. 466, Quinteros relies on both juror No. 8's statement to the court during in-camera questioning that Officer Bravo very calmly came down off the witness stand and stood in front of Macias after Macias attacked his attorney, and on the prosecutor's statements showing Agent Epperson rushed to Burgener's aid. Quinteros's contention is unavailing because *Turner* is distinguishable. In *Turner*, the Supreme Court reversed the defendant's murder

24

conviction based on its conclusion the defendant was denied his constitutional right to a fair trial by an impartial jury when two deputy sheriffs, who were the prosecution's principal witnesses, were placed in charge of the sequestered jurors, ate with them, conversed with them, and did errands for them during the course of the three-day trial. (*Turner*, *supra*, 379 U.S. at pp. 468, 474.)  The *Turner* court reasoned that, "even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution."  (*Id*. at p. 473.)  Quinteros's reliance on *Turner* is misplaced because there is no evidence that Officer Bravo and Agent Epperson had such a continuous and intimate relationship with the jurors.

We therefore reject Quinteros's claim he was denied his federal constitutional right to a fair trial by impartial jurors.

## II.  *ABUSE OF DISCRETION CLAIM*

Quinteros next contends the court abused its discretion when it found Macias's courtroom attack on his attorney did not warrant a mistrial or new trial because it failed to consider whether the courtroom attack was inherently prejudicial under an objective standard.  This contention is unavailing because we have already concluded Macias's attack on his attorney, judged objectively, was not so prejudicial, in and of itself, as to cause inherent juror bias against Quinteros.

### III. *USE OF PHYSICAL RESTRAINTS*

Quinteros also contends his conviction must be reversed because the court prejudicially abused its discretion and violated his federal constitutional right to due process by (1) ordering that he be restrained during trial without making a finding of manifest need to do so and (2) allowing him to be visibly restrained and handcuffed in front of the jury during a hearing following Macias's attack on his attorney. We reject these contentions.

### A. *Background*

On December 13, 2012,[11] in the presence of the jury about one minute after Officer Bravo, Macias slashed his attorney's cheek with a small razor. The defendants were removed from the courtroom before the jury left the courtroom. Later that morning, outside the presence of the jury, the court made a brief record (discussed, *ante*) of the details of Macias's attack on his attorney.

The next morning, December 14, outside the presence of the jury, the court conducted a hearing at which Burgener, who had received what he described as "fine" stitches for his facial wound, informed the court he was prepared to go forward with closing argument on Macias's behalf. In discussing the courtroom attack with the parties' attorneys, the court began by finding that Quinteros was currently serving a 13-year prison sentence, Macias was serving a 26-year prison sentence, and Polina had a "long prison record."

---

11    All further dates are to calendar year 2012.

The court then made the following record—still outside the presence of the jury—pertaining to the use of physical restraints in this case before and after Macias's courtroom attack on Burgener:

> "*So during the entire course of the trial*, all—I don't know if we ever put this on the record—*all three defendants have been bolted down with an I-bolt to the floor*. So that means that *they have leg chains on that are strung to an I-bolt that's cemented into the floor* so they can't stand up all the way. But there's a skirt around the table, so *the fact that they're bolted down . . .* is *not apparent to the jury*.

> "And so *that was done because of the fact that they all have long and violent histories, and because two of them are sentenced prisoners*, and so as a precautionary measure, we had them bolted down, although their hands were free.

> "Now that Mr. Macias has attacked Mr. Burgener, I think it's appropriate and necessary to have Mr. Macias chained even in the presence of the jury, with him not have [*sic*] his hands free, although *once the jury comes in*, Mr. Polina and [*Quinteros*] *will appear unhandcuffed with their hands not restrained*.

> "And then when Mr. Macias testified, we excused the jury. Mr. Macias got on the stand. He did have leg chains on, but there—it may be apparent to one alternate juror, but not to the other jurors because of the configuration of the witness stand. And then when he was done testifying, we sent the jury out and he came off the stand, so they did not see that he had leg chains on.

> "So I just want to put that on the record, because we had not put that on the record before. *There was no objection from any of the attorneys or the defendants to being chained down, bolted down that way*, so that's the way we proceeded, because *we needed that extra security*. And apparently that was not even good enough to prevent what happened yesterday." (Italics added.)

Later that morning, as already discussed, the court conducted an in camera hearing and individually questioned each of the 12 jurors and three alternate jurors to determine whether they were able to put aside their observations of the Macias's courtroom attack

27

on Burgener and fairly and impartially evaluate the evidence. Although the defense attorneys were present during the hearing, the defendants—Quinteros, Macias, and Polina—were not present.

Later, at around 12:16 p.m. that same day (December 14), the court conducted a brief hearing at which Quinteros, Macias, Polina, and their counsel appeared in the presence of the jury. At that hearing, which the record shows lasted only a few minutes, the court admonished and excused the jury, directing them to return on December 19. Outside the presence of the jury, the court conducted a hearing on Polina's mistrial motion, which Quinteros joined.[12] As discussed, *ante*, the court denied the motion.

At the next hearing, held outside the presence of the jury on December 19, Polina's attorney, apparently joined by Quinteros's counsel, renewed the motion for a mistrial, asserting that the jury saw Polina (and Quinteros) shackled on December 14. The court denied the motion, noting that Polina and Quinteros were "shackled in front of the jury very briefly," but were no longer shackled and would not be shackled. Polina's and Quinteros's attorneys declined the trial court's offer to provide the jury a limiting instruction regarding shackles. The court noted that some of the jurors may have seen the

---

[12] Quinteros suggests he joined Polina's mistrial motion because "the parties had earlier entered into an agreement that all defendants would automatically join any motion made by one unless otherwise indicated." The record does show that, during the hearing on the parties' pretrial motions, the court stated to all three defense attorneys, "[W]e'll assume that every motion that's made by each of you is joined by the others, unless otherwise indicated."

28

defendants getting unchained from the floor[13] on the day of Macias's courtroom attack on his attorney when they were taken out of the courtroom, but this would have been the first time the jurors became aware that the defendants were restrained. The court further noted that, except for "that one brief hearing" at which Polina's and Quinteros's hands were shackled for about five minutes, their hands had never been shackled in court and only Macias continued to be shackled. The court then indicated it intended to instruct the jury that the fact Macias was shackled was not evidence and must be disregarded in deciding the issues of the case.

Shortly thereafter, the jurors were brought back into the courtroom and the court instructed them under CALCRIM No. 204 as follows:

> "[T]he fact that physical restraints have been placed on defendant Eduardo Macias is not evidence. Do not speculate about the reason. You must completely disregard this circumstance in deciding the issues in this case. Do not consider it for any purpose or discuss it during your deliberations."

B. *Applicable Legal Principles*

A trial court has broad power to maintain courtroom security and orderly proceedings, and its decisions regarding security measures in the courtroom are generally reviewed for abuse of discretion. (*People v. Stevens* (2009) 47 Cal.4th 625, 632.) However, the California Supreme Court has explained that "despite our traditional deference to the trial court in this area, some extraordinary security practices carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial." (*Ibid.*) "For

---

13    The court explained that, although the three defendants had been "I-bolted down," there was "a skirt around the table so the jurors [could not] see that."

example, visible physical restraints like handcuffs or leg irons may erode the presumption of innocence because they suggest to the jury that the defendant is a dangerous person who must be separated from the rest of the community." (*Ibid.*)

In *Deck v. Missouri* (2005) 544 U.S. 622, 629, the United States Supreme Court held that the right to due process of law guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution "prohibit[s] the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." The high court explained that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury . . . . The constitutional requirement, however, is not absolute. It permits a judge, in the exercise of his or her discretion, to take account of special circumstances, including security concerns, that may call for shackling." (*Id.* at p. 633.) The *Deck* court recognized the need to restrain dangerous defendants to prevent courtroom attacks and the need to give trial courts latitude in making individualized security determinations. (*Id.* at p. 632.) The Supreme Court concluded that "where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" (*Id.* at p. 635, quoting *Chapman, supra,* 386 U.S. at p. 24.)

The California Supreme Court has followed similar principles by holding that "a defendant may be physically restrained at trial only if there is a 'manifest need for such

30

restraints.'" (*People v. Seaton* (2001) 26 Cal.4th 598, 651, quoting *People v. Duran* (1976) 16 Cal.3d 282, 291 (*Duran*); see also § 688 ["No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."].)  A trial court "retains discretion to order restraints when they are needed to protect against courtroom violence or other disruptions." (*People v. Stevens*, *supra*, 47 Cal.4th at p. 633.)

Of particular importance here, the California Supreme Court has explained that "[e]ven a jury's brief observations of physical restraints generally have been found nonprejudicial." (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1213, citing *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584 (*Tuilaepa*); *People v. Rich* (1988) 45 Cal.3d 1036, 1084.)  The Supreme Court has also explained that "[p]rejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period either inside or outside the courtroom by one or more jurors or veniremen.'" (*Tuilaepa*, at p. 584, quoting *Duran*, *supra*, 16 Cal.3d at p. 287, fn. 2.)

In *Duran*, our high court explained that "[t]he showing of nonconforming behavior in support of the court's determination to impose physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence." (*Duran*, *supra*, 16 Cal.3d at p. 291.)  Furthermore, "[t]he imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other noncomforming conduct will be deemed to constitute an abuse of discretion."  (*Ibid*.)

31

C. *Analysis*

Addressing first Quinteros's claim that the court abused its discretion in ordering that he be restrained during trial without making a finding there was a manifest need to do so, we conclude Quinteros forfeited this claim. As noted, the court stated that the defendants had been bolted down with an I-bolt to the floor during the course of the trial before Macias attacked his attorney, and they were still restrained in this manner at the time of the attack. The court also stated that these restraints were "not apparent to the jury" prior to Macias's attack on his attorney because "there's a skirt around the table."

The California Supreme Court has explained that "[i]t is settled that the use of physical restraints in the trial court cannot be challenged for the first time on appeal [and a d]efendant's failure to object and make a record below waives the claim." (*Tuilaepa*, *supra*, 4 Cal.4th at p. 583, citing *People v. Stankewitz* (1990) 51 Cal.3d 72, *People v. Walker* (1988) 47 Cal.3d 605, 629 & *Duran*, *supra*, 16 Cal.3d at p. 289.)

Here, the court found that "[t]here was *no objection* from any of the attorneys or the defendants to being chained down, bolted down that way, so that's the way we proceeded, because we needed that extra security." (Italics added.) Indicating it believed such restraints proved to be inadequate in light of the security risk, the court added, "And apparently that was not even good enough to prevent what happened yesterday." By failing to object below to the leg chain and I-bolt restraint he was required to wear, Quinteros forfeited his claim on appeal that the court abused its discretion in ordering that he be restrained in this manner during trial. (*Tuilaepa*, *supra*, 4 Cal.4th at p. 583.)

Quinteros, however, contends in his reply brief that his "lack of objection to the initially non-visible restraints should not be considered [a] forfeiture of his constitutional right to be free from visible restraints where those restraints became visible to the jury through no fault of his own." This contention is unavailing. As noted, the court found that some of the jurors "may have seen" the defendants getting unchained from the floor after Macias's attack on his attorney, but that this would have been the first time the jurors became aware the defendants were restrained. However, even if we were to assume both that the issue is preserved despite Quintero's failure to object below to the I-bolt restraint and that an abuse of discretion is shown, at most the record establishes what the Supreme Court characterized in *People v. Rich*, *supra*, 45 Cal.3d at page 1084, as "minor and nonprejudicial error." (Cf. *Tuilaepa*, *supra*, 4 Cal.4th at p. 584 ["Prejudicial error does not occur simply because the defendant 'was seen in shackles for only a brief period . . . inside . . . the courtroom by one or more jurors . . . .'"].) Also, since the courtroom security personnel could not know whether Macias was acting on his own, his attack on Burgener unquestionably created a manifest need for them to take immediate steps to secure the courtroom, remove the I-bolt restraints, and take the defendants from the courtroom.

We also reject Quinteros's contention that the court prejudicially abused its discretion and violated his federal constitutional due process right to a fair trial by an impartial jury by allowing him to be briefly handcuffed in front of the jury when the jury returned the day after Macias's attack on his attorney. The record shows this was the first time following the incident that the jurors were again in the courtroom in the presence of

33

the defendants, and it shows the hands of all three defendants were shackled. This brief use of visible physical restraints was a reasonable measure that demonstrated to the jury that courtroom security had been restored. The record also shows this hearing lasted only a few minutes while the court admonished and excused the jury with directions to return on December 19. This was also the last time Quinteros's hands were shackled in the presence of the jury. When the jurors returned to listen to the parties' closing arguments, Quinteros's and Polina's hands were not shackled—only Macias's hands remained shackled.

As prejudicial error does not occur simply because the defendant was seen in shackles for only a brief period inside the courtroom by one or more jurors (*Tuilaepa*, *supra*, 4 Cal.4th at p. 584), we conclude the court did not prejudicially abuse its discretion or violate Quinteros's federal constitutional due process right to a fair trial by an impartial jury. Our conclusion is supported by the fact the jury ultimately acquitted Quinteros of conspiracy to commit murder and attempted murder, and found the gang enhancements allegations were not true.

IV. *BOOKING FEE*

The probation report recommended that the court order Quinteros to pay a $154 "Criminal Justice Administration Fee pursuant to [Government Code section] 29550.1."[14] At sentencing, the court ordered Quinteros to pay various fines and fees,

---

14    Government Code section 29550.1 provides in part: "Any city, special district, school district, community college district, college, university, or other local arresting agency whose officer or agent arrests a person is entitled to recover any criminal justice

34

including a $154 "booking fee."  However, the court did not cite the statutory authority for the booking fee it imposed, and Quinteros did not object on any ground to the imposition of that fee.  On the form minute order, next to a handwritten entry of "$154," the clerk checked a box marked "CRIM JUSTICE ADMIN FEE (§ GC29550 et seq.]."

Asserting that the court imposed the $154 booking fee under Government Code section 29550.1 in accordance with the incorrect probation report recommendation, Quinteros contends the fee is unauthorized and must be reversed, and this matter must be remanded for imposition of the correct fee under Government Code section 29550.2, which (unlike Government Code section 29550.1) requires a finding that the defendant has the ability to pay the fee, because he was not arrested by an officer of an agency listed in Government Code section 29550.1.  The Attorney General responds that (1) "it should be presumed that the trial court imposed the fee pursuant to the applicable Government Code section," and (2) Quinteros forfeited his claim by failing to raise it at sentencing.

"[A] defendant who fails to contest [a] booking fee when the court imposes it forfeits the right to challenge it on appeal."  (*People v. McCullough* (2013) 56 Cal.4th 589, 591.)

administration fee imposed by a county from the arrested person if the person is convicted of any criminal offense related to the arrest.  A judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee by the convicted person, and execution shall be issued on the order in the same manner as a judgment in a civil action, but the order shall not be enforceable by contempt."

35

Here, Quinteros contends this matter should be remanded for resentencing "for a determination as to whether [he] has the ability to pay the booking set forth in Government Code section 29550.2, subdivision (a)." Implicit in this contention is Quinteros's claim that the evidence is insufficient to support a booking fee order. However, as it is undisputed he did not object on any ground to the booking fee order when it was imposed, we conclude he has forfeited his right to challenge that order for the first time on appeal. (*People v. McCullough*, *supra*, 56 Cal.4th at p. 591.)

## DISPOSITION

The judgment is affirmed.

NARES, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.