Filed 1/22/15  P. v. Vargas CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JESUS MIGUEL VARGAS,<br><br>    Defendant and Appellant. | B252425<br><br>(Los Angeles County<br>Super. Ct. No. KA097700) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed.

Thomas T. Ono, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Jesus Miguel Vargas appeals the judgment following his conviction for one count of first degree murder with a firearm enhancement, raising various claims of error. We find no error warranting reversal and affirm.

## PROCEDURAL BACKGROUND

Following trial, a jury convicted appellant of one count of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true an allegation he personally and intentionally discharged a firearm proximately causing the victim's death (§ 12022.53, subd. (d)). The trial court sentenced appellant to 25 years to life for the murder and consecutive 25 years to life for the firearm enhancement. It imposed various fines, fees, and credits not at issue here. Appellant timely appealed.

## FACTUAL BACKGROUND

On February 24, 2012, the day of the murder, appellant and Francisco Garcia began conversing at Garcia's house in Pomona, California. Around 2:00 or 3:00 p.m., they walked to a nearby store, purchased two 32-ounce beers each, returned to Garcia's house, and drank them within about an hour while continuing to talk. According to Garcia, appellant appeared to be in a "pretty good mood," saying he was "doing good" and "working." He did not seem agitated or angry about anything. They left Garcia's house around 5:45 p.m. because Garcia had to pick up his child from a nearby school. As they walked, appellant split off from Garcia and headed down Hyde Avenue toward a group of six or seven people playing basketball in a mainly residential cul-de-sac. Garcia continued on alone. Garcia did not recognize anyone in the group. Garcia told officers appellant said he was going to "talk to his friends." About 10 to 15 minutes later, Garcia heard about three to four gunshots. When later interviewed, Garcia told officers appellant was a member of the Island Block Criminals gang, although at trial Garcia denied familiarity with any gangs in Pomona, including the Island Block Criminals, and denied saying appellant was an Island Block Criminals gang member known as "Stalker."

---

[1] All undesignated statutory citations are to the Penal Code unless otherwise noted.

At the time of the murder, Carlos Guzman was riding his bicycle on San Antonio Avenue when he heard about three gunshots. He saw someone resembling appellant run past him from the shooting area. When later shown a photographic lineup containing a three-year-old photograph of appellant, he said the photograph looked like appellant, although he could not be "positive." In a second photographic lineup with a more current photograph, Guzman could not identify appellant.

Just before the shooting, Miguel Gomez was at the basketball hoop with the victim Alfonso Enciso, among others. He knew Enciso as "Little D" and "Junior." He and another man went to the store to buy beer. When they returned 15 minutes later, he saw Enciso "about to get in a fight" with another man, although Gomez only saw the back of the other man's head. Gomez told Enciso to "chill out," and he heard five gun shots. Gomez was still in his van at the time, so he started a three-point U-turn, but Enciso was injured and tried to jump into his driver's-side window. Gomez then laid him down on the ground and ran to call 911. He did not get a good look at the shooter and was unable to identify anyone at trial.[2]

Fabio Moreno had known Enciso for nine years and was with him and Gomez at the time of the shooting. He had met appellant around the same time he met Enciso and there was a time they hung out together, but as they grew up, they stopped talking and were no longer friends. As soon as Enciso was shot, Moreno panicked and ran away. Police picked him up the next day.

At trial, Moreno did not recall most details from the day of the shooting or what he told police.[3] He recalled seeing someone with a gun, although he did not remember who, and he did not recall seeing appellant on the day of the shooting. Nor did he recall identifying appellant in a six-pack photographic lineup. Four days after the shooting he

---

[2]     Gomez did not voluntarily testify at trial. He testified someone talked to him about not coming into court, but he was not threatened. He was concerned about testifying, however.

[3]     Like Gomez, Moreno did not testify voluntarily at trial.

was interviewed by police and a recording of that interview was played for the jury. In it, he identified appellant as the shooter. He said four or five guys were playing basketball when he saw two men pass by. One went on to pick up his son at school while appellant started "mad dogging" Enciso. When Enciso said, "what's the problem," appellant pulled out a gun and said "fuck cheese side." Appellant then started shooting as Enciso was walking away. Moreno explained he, appellant, and Enciso had grown up together and had been friends. Enciso and appellant had gotten into a previous altercation and he, Enciso, and appellant had other "little problems." He said "cheese side" was a disrespectful slang term for "East Side," which was Enciso's gang.

Enciso died from a single gunshot wound that entered his back and exited the lower part of his ribcage, striking his lung, heart, and liver. At the scene of the shooting, officers found bullet holes in the walls and window panes of a nearby house, a "copper, shiny object" in a bullet hole in the wall inside the house, and at least one spent round in the street.

Immediately after the shooting, Detectives Michael Lange and Andrew Bebon began searching for appellant as a suspect. Two months later a police fugitive apprehension team reported seeing appellant at his home in Pomona. After the police set up a perimeter and conducted several announcements, appellant exited the back door and reentered the house after he saw officers in the backyard. He emerged from the front door with one of his sisters, at which point he was arrested.

Detective Bebon testified as a gang expert for the prosecution. He had been a Pomona police officer for 25 years and had extensive training and experience with criminal street gangs. During the investigation of Enciso's shooting, he became familiar with the Island Block Criminals gang. He opined appellant was a member of the Island Block Criminals based on several facts: appellant had several tattoos associated with the Island Block Criminals, which individuals use to identify themselves and others as gang members; a search warrant executed on appellant's home yielded "a lot of writings in his room" related to the Island Block Criminals; and, to the best of Detective Bebon's knowledge, appellant admitted he was a member of the Island Block Criminals when he

4

was arrested. Detective Bebon further testified the term "cheese side" was a derogatory term for the East Side Pomona gang and Enciso had an "ESP" tattoo, which was consistent with membership in East Side Pomona. Although Detective Bebon was not personally aware of a rivalry between Island Block Criminals and East Side Pomona before the shooting, he had since become aware a rivalry existed.

In defense, appellant presented two alibi witnesses. His brother Julian Vargas testified he briefly stopped at his house to pick up his soccer cleats between 5:50 and 6:00 p.m. on the day of the shooting and saw appellant outside drinking a beer and smoking a cigarette. Five minutes later, Julian[4] left for soccer practice. When he returned home at 9:00 p.m., he knocked on appellant's bedroom door. Appellant did not answer but Julian heard him tossing in bed. Jose Escamilla was Julian's friend and they played on the same soccer team. He testified their soccer practices would typically start no later than 6:00 p.m. He recalled going to appellant's house with Julian on the day of the shooting between 5:55 and 6:10 p.m. and seeing appellant there.

### DISCUSSION

*1. Admission of Gang Expert Testimony*

Appellant contends the trial court abused its discretion and denied his right to a fair trial and jury trial when it allowed Detective Bebon to testify as a gang expert to support the prosecution's theory that appellant's motive in killing Enciso was gang-related. We disagree.

Prior to trial, appellant objected to the prosecution's introduction of gang evidence because no gang allegation was alleged in the case. The trial court characterized appellant's request as one "to exclude mention of gang evidence in this case essentially on [an Evidence Code section] 352 basis; that it's so inflammatory and prejudicial that it would deny [appellant] of a right to a fair trial. Given that there are no gang allegations alleged or most certainly sustained by the magistrate at the preliminary hearing, to allow

---

**4**    We refer to Julian by first name only to avoid confusion with appellant. No disrespect is intended.

it now would be prejudicial. I've heard the People's position already in terms of establishing a motive to commit the crimes because of the familiarity between [appellant] and the decedent, the victim in this case. Evidently they grew up together, obviously went their separate ways in terms of gang affiliation and found themselves on opposite ends of gang membership or affiliation issue. Evidently the defendant's gang is a rival of the victim's gang. Evidently that may have resulted in the encounter that preceded the actual shooting in this case." The court added, "It became abundantly clear when I ordered back one of the defense witnesses who the People have identified as an alibi witness that also kind of makes a motive issue even more relevant and [appellant] is essentially claiming that he is not the person who committed the crime, that it was someone else who perhaps had a motive to commit the crime and he did not. Again, that is the issue that evidently we have in this case. Motive is an issue that the court certainly has to take into consideration, most certainly, when there is no other explanation available as to why this type of crime occurred. There is something to explain it. I mean, it could be anything, quite frankly, under the sun, but the People's theory, from what I'm hearing, is the gang rivalry that is present, nothing else to explain why someone who wants to kill this person."

The prosecutor pointed out Moreno told officers appellant exclaimed "fuck cheese side" before he shot Enciso, with "cheese side" being a derogatory term for East Side Pomona. The court agreed "[i]t sounds relevant and probative." It added, "The courts by way of case law authority should be very cautious in allowing gang evidence into a case in which no gang allegation has been alleged because of obviously the inflammatory nature of the allegation and the evidence that the jury would hear. But, again, keep in mind we can't treat gang evidence like nuclear waste, so to speak. Sometimes it is relevant and probative in a case that does not contain a gang allegation to, again, help explain the motive behind the killing."

After further discussion on a related issue, the court ruled as follows: "[T]he issue of the gang rivalry is relevant and admissible, purportedly the defendant's gang affiliation and the fact that he made a statement at or near the time the shot was fired supporting his

affiliation, making it a gang related type of shooting, and that is what is relevant and that is what would explain it, so it is relevant. It's admissible even under a[n Evidence Code section] 352 analysis and I will permit it. But, again, the People must have competent evidence that there is, in fact, a gang attributed to the defendant and that there is, indeed, a rivalry between that gang and another gang that evidently the defendant believed the victim may have some affiliation with. That needs to come through the gang expert, I would imagine, more so than any other source."

Defense counsel argued there was no indication appellant "professed any allegiance to Island Block Criminals to the incident at hand. And I think simply stating fuck cheese side without any other particularized information regarding an ongoing dispute between the two, I think at this point would be insufficient evidence to support mentioning gangs in that respect." The court noted evidence of the gang-related items seized from appellant's house during the search "would support at least the membership or affiliation or some type of association with a particular gang" and if there was evidence East Side Pomona and Island Block Criminals were rival gangs, "that makes the important connection that could help establish the motive for the killing. It's strictly because of this rivalry that may have been in existence at the time. And that's all that is necessary, quite frankly, especially when there is nothing else to explain why a person like [appellant] would want to harm this individual. That's why I asked is there any other evidence of motive independent of this rivalry, this gang, and evidently there is not. To deprive the People of their evidence on that point would deny them a fair trial, most certainly. I think the jury needs to hear it and needs to evaluate it and because obviously any fact finder would want an explanation as to why someone would go to this extent to end a human being's life. It has to be something very important, not just a random shooting with no explanation. So motive evidence is critical, especially in a case of this nature, so I will permit the evidence to come in based on the People's offer of proof."

"Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent,

7

means of applying force or fear, or other issues pertinent to the guilt of the charged crime." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049; see *People v. Williams* (1997) 16 Cal.4th 153, 193.) Further, police officers properly qualified as experts may offer opinions on the culture and habits of criminal street gangs. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617; see *Williams, supra*, at p. 196.) In admitting gang evidence, the trial court must be mindful of the "risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged," but such evidence nevertheless remains admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194 (*Carter*).)

Here, the trial court did not abuse its discretion in finding Detective Bebon's testimony was highly probative of appellant's gang-related motive in killing Enciso and was not unduly prejudicial. Detective Bebon's testimony that appellant was a member of Island Block Criminals, Enciso was a member of East Side Pomona, and the two gangs were rivals was critical to explain appellant's exclamation of "fuck cheese side" when he shot Enciso, which was a derogatory term for East Side Pomona. Further, as the trial court recognized, Detective Bebon's expert testimony provided the crucial link from which the jury could have inferred Enciso's killing was gang-motivated, especially given there was no other explanation for the shooting. (See *People v. Tuilaepa* (1992) 4 Cal.4th 569, 588 ["Testimony linking defendant and [participant in fight] to rival gangs was admissible because it tended to explain the reason for the fight."], affirmed on other grounds by *Tuilaepa v. California* (1994) 512 U.S. 967.) Nor was it unduly prejudicial as compared to the evidence that appellant boldly walked up to Enciso on a residential street while he stood among his friends and fatally shot him. And none of the gang evidence related at all to *other crimes* committed by appellant's gang, so there was little risk the jury would simply infer appellant had a criminal disposition from his gang membership alone.

In challenging Detective Bebon's testimony, appellant focuses on the fact that Detective Bebon was never asked a hypothetical question about whether a shooting in

similar circumstances would have been gang-motivated. While it is certainly true a gang expert *may* testify by way of hypothetical questions (*People v. Vang* (2011) 52 Cal.4th 1038, 1045), appellant cites no authority to suggest an expert *must* do so. Nor were hypothetical questions necessary in this case. The jury could have readily inferred the shooting was gang-motivated based on Detective Bebon's testimony and the other evidence showing appellant and Enciso were members of rival gangs, coupled with appellant's exclamation "fuck cheese side" just before the shooting. We also reject appellant's claim of federal constitutional error, which is entirely dependent on his state-law claim of error. (*Carter, supra*, 30 Cal.4th at p. 1196.)

## 2. *Sufficiency of the Evidence of Premeditation and Deliberation*

Appellant argues insufficient evidence supported the jury's finding of deliberation and premeditation, which violated his due process rights. We disagree.

"'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Tafoya* (2007) 42 Cal.4th 147, 170.) "'[G]enerally first degree murder convictions are affirmed when (1) there is evidence of planning, motive, and a method of killing that tends to establish a preconceived design; (2) extremely strong evidence of planning; or (3) evidence of motive in conjunction with either planning or a method of killing that indicates a preconceived design to kill.' [Citation.] These factors are not the exclusive means, however, to establish premeditation and deliberation . . . ." (*Id.* at p. 172.) "Thus, while premeditation and deliberation must result from "'careful thought and weighing of considerations'" [citation], we continue to apply the principle that '[t]he process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ."'" (*People v. Bolin* (1998) 18 Cal.4th 297, 332.)

9

Here, the evidence was plainly sufficient to demonstrate appellant killed Enciso with premeditation and deliberation because it showed both a method of killing indicating a preconceived design to kill and a motive. Having been in a "pretty good mood" just before the shooting, appellant approached Enciso and the others on a public street with a loaded firearm and, after an argument with Enciso, shouted "fuck cheese side" and fired at least three (and as many as five) shots at Enciso as he walked away, one of which hit him in the back and killed him. (See *People v. Manriquez* (2005) 37 Cal.4th 547, 578 [sufficient evidence of deliberation and premeditation from evidence that "defendant, armed with a concealed firearm, left his room at the motel, angrily confronted the victim, and fired several times, inflicting multiple wounds to the victim's chest"].) As discussed above, there was also strong evidence of a gang-related motive. Although appellant argues the evidence demonstrated at most a heated exchange between appellant and Enciso, that goes to the weight of the evidence, and the jury rejected that theory when it found first degree murder instead of voluntary manslaughter, on which it was also instructed.

### 3. Motion for Mistrial

Before trial, the trial court instructed the jury, "Do not take anything I say or do during this trial as an indication of what I think about the facts, the witnesses or what your verdict should be." Just before the jury retired to deliberate, the court repeated this instruction.

During the trial after Moreno finished testifying, the trial court made the following comment in front of the jury: "Before the next witness is sworn, I think the record should reflect, and it certainly is silent on the point up until now, that during the majority of witness Fabio Moreno's testimony, he stared downward toward his lap area while on the witness stand and through the majority of his testimony covered his face with his right hand."

Appellant did not object to the statement or request a jury admonition at the time, but he moved for a mistrial the next morning. Defense counsel conceded the trial court's description of Moreno's demeanor was accurate, but argued the comment invaded the

10

province of the jury. The court explained the comment was not for the jury's benefit, but for the "record's benefit, and that was made abundantly clear. It was absolutely vital as to his conduct on the witness stand, and I described his conduct, as you agree, fairly accurately. That's for the record. [¶] It's the record I'm conscious of and that I'm trying to protect. Without that description I think it detracts from the quality of Mr. Moreno's testimony and the significance of his comment in relation to his testimony. [¶] Again, it wasn't done for the jury's benefit. They witnessed the same thing I commented on the record. I don't think my comments were designed to influence their perception at all. Quite frankly, they were instructed not to do that, quite frankly. Anything I say or do during the trial, they should not take as an indication of what I think about the facts, the witnesses, or what their verdict should be. [¶] So you're protected, and the jury appropriately instructed that they are not to consider my comments in that respect. But again, it was more for the purpose of protecting the record. I think that was important especially given the significance of his testimony and the nature of his testimony. [¶] I think that bolstered the meaning of what he had to say. And again, if I was a lawyer witnessing that, I would definitely have commented on that, made the record, most certainly, that that was his conduct as displayed during his testimony. [¶] It's not misleading the jury or improperly influencing them at all, quite frankly. It's protecting the record, which I think is absolutely necessary."

Appellant contends the trial court abused its discretion in denying his motion for a mistrial. We disagree. "We review the denial of a motion for mistrial under the deferential abuse of discretion standard. [Citations.] 'A motion for mistrial is directed to the sound discretion of the trial court. We have explained that "[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions."'" (*People v. Cox* (2003) 30 Cal.4th 916, 953, overruled on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

11

"The court may make any comment on the evidence and the testimony and credibility of any witness as in its opinion is necessary for the proper determination of the cause." (Cal. Const., art. VI, § 10; see §§ 1127, 1093, subd. (f).) "A trial court has 'broad latitude in fair commentary, so long as it does not effectively control the verdict.'" (*People v. Linwood* (2003) 105 Cal.App.4th 59, 73.) Any judicial comments on the evidence "'"must be accurate, temperate, nonargumentative, and scrupulously fair. The trial court may not, in the guise of privileged comment, withdraw material evidence from the jury's consideration, distort the record, expressly or impliedly direct a verdict, or otherwise usurp the jury's ultimate factfinding power."'" (*People v. Proctor* (1992) 4 Cal.4th 499, 542 (*Proctor*), affirmed on other grounds by *Tuilaepa v. California, supra*, 512 U.S. 967.) "'"The propriety and prejudicial effect of a particular comment are judged both by its content and by the circumstances in which it was made."'" (*Linwood, supra*, at p. 73.)

The trial court did not abuse its discretion in denying appellant's motion for a mistrial because appellant suffered no conceivable prejudice from the court's comment in front of the jury that would have warranted a new trial. While the court enjoys wide latitude to comment on the evidence, here the court was not commenting on the evidence for the jury's benefit, but in order to ensure the record accurately reflected Moreno's demeanor. Whether or not the trial court erred in doing so in front of the jury—a point we need not decide—the better practice would have been to make its record outside the jury's presence. But as the trial court noted, the jury observed Moreno's behavior on the stand—which defense counsel conceded was accurately described by the trial court—and the jury was instructed *twice* not to take the court's comments on witnesses as an indication of the court's view of the facts or verdict.[5]

---

[5]    Contrary to appellant's argument, even if the court's comment was for the jury's benefit, the court was permitted to comment on Moreno's demeanor without also commenting on any other witness. (*Proctor, supra*, 4 Cal.4th at p. 542 ["'"[A] judge may restrict his comments to portions of the evidence or to the *credibility of a single witness* and need not sum up all the testimony, both favorable and unfavorable."'"].)

We also reject appellant's contention the trial court was obligated to sua sponte instruct the jury with CALCRIM No. 3530 after it commented on Moreno's demeanor. That instruction states:  "Do not take anything I said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdict should be.  [¶]  Now, I will comment on the evidence only to help you decide the issues in this case.  [¶]  However, it is not my role to tell you what your verdict should be.  You are the sole judges of the evidence and believability of witnesses.  It is up to you and you alone to decide the issues in this case.  You may disregard any or all of my comments about the evidence or give them whatever weight you believe is appropriate."  As we have noted, the court twice instructed the jury consistent with CALCRIM No. 3530, and appellant cites no cases requiring the trial court to repeat the instruction a third time during trial absent a request from appellant to do so.  In any case, because the trial court gave the instruction, there was no reasonable probability any error in failing to sua sponte repeat it prejudiced appellant.  (See *People v. Breverman* (1998) 19 Cal.4th 142, 165.)

## DISPOSITION

The judgment is affirmed.

FLIER, J.

WE CONCUR:

BIGELOW, P. J.

RUBIN, J.

13